87 So.2d 646

**EMPLOYERS INSURANCE COMPANY OF ALABAMA, Inc.**

v.

**James V. RIVES.**

**6 Div. 270.**

Court of Appeals of Alabama.

Oct. 6, 1953.

Rehearing Denied Oct. 27, 1953.

Reversed After Remandment Jan. 10, 1956.

Rehearing Denied Feb. 7, 1956.

Lange, Simpson, Robinson & Somerville, Birmingham, for appellant.

Spain, Gillon, Grooms & Young and Burgin Hawkins, Birmingham, for appellee.

PRICE, Judge.

This is an action upon a liability insurance policy issued to plaintiff by the Employers Insurance Company, Inc., a corporation, wherein the insurer agreed "To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the use thereof, caused by accident and arising out of the hazards hereinafter defined."

The cause was tried, upon an agreed statement of facts, by the court without the intervention of a jury, resulting in a judgment for plaintiff in the sum of $850. Defendant appeals.

The assignment of error is that the trial court erred in rendering and entering final judgment in favor of the plaintiff and against the defendant. It is appellant's insistence (1) that the damage was not caused by an accident; (2) liability was excluded from the coverage of the policy.

In view of the fact that we have reached the conclusion that appellant's first insistence is well founded, we do not deem it necessary to pass upon the second question raised. We, therefore, set out the stipulation as to the facts only insofar as is here pertinent.

"Stipulation As To Facts

"On to-wit: July 6, 1948, plaintiff, J. V. Rives doing business as Rives Construction Company, entered into a contract with one R. C. Williams of Alabaster, Shelby County, Alabama, jobber for the Shell Oil Company, to install two Tokheim Pumps in place of two old pumps in the filling station of one Buck Wooton at Alabaster, Alabama and to connect said pumps with the underground tanks at said station; that said work was performed on to-wit: July 6th, 7th, 8th and 9th, 1948; that in the process of the performance of this work an old line with a union joined by a connecting nut was uncovered and a disconnection was made in the old line by unscrewing a nut at the union in the old line. In the process of completing the job the pipe and connecting nut was re-covered with earth; that on or about the middle of September, 1948, Mr. Wooton, the station operator, advised Mr. Williams, the jobber, that he was

suffering an unusual loss of gasoline and requested that some investigation be made as to how this gasoline was disappearing. Mr. Williams in turn requested the plaintiff to send his crew back to the station and to dig up the line in order to see if the trouble could be ascertained. When the line was again uncovered it was found that the union in the line that had been disconnected by plaintiff's employees was leaking and that at the time of and while making the installation the employees had accidentally and negligently failed to retighten the connecting nut at the union, which nut was so loose that it could be turned with the hand; that up to that time there had been a loss of approximately One Thousand (1,000) gallons of gasoline over and above normal loss for evaporation; that about the time the shortage in the gas was discovered, one Mr. Roscoe Davis, who lived about three hundred feet (300') from the filling station where the installation was made, complained and contended that his well was contaminated with gasoline; that an analysis was then made to determine whether the well was contaminated and it was found that the water was one percent (1%) gasoline; that there was a check made of the strata of the rock formation between the location of the pumps and the well and it was found that the layers of rock ran in the direction of the well; that it was agreed with Mr. Davis that the well would be allowed to set thoroughly for a period of sixty days following the correction of the leak in the pipe to determine whether the well would clear up; that at the end of the waiting period it was found that the well was still contaminated with gasoline. When the ground was uncovered to ascertain the cause of the leak it was found that the ground at the point of the loose connection was thoroughly saturated with gasoline; that when the connecting nut which had been left loose was tightened there was no further loss from the tanks; that the plaintiff did not furnish the pumps or any of the material but furnished only labor for the performance of the job; that the nut and the pipe on both sides of the nut was a part of the original installation;

that when it was found that the well was still contaminated, Mr. Davis then made claim for the value of the well; that the plaintiff ascertained that the cost of constructing said well would be approximately One Thousand Two Hundred Dollars ($1,200.00); that the plaintiff notified the defendant of the damages and called upon the defendant to take over the defense of said claim and to take whatever action the defendant might deem necessary in the premises; that the defendant declined and refused to assume any liability as to said claim, basing its declination on the ground that under the terms of its policy, coverage was not extended for this particular accident; that following such declination of liability plaintiff negotiated settlement with Roscoe Davis, paying him the sum of Eight Hundred Fifty Dollars ($850.00) as the fair and reasonable value for the damages that he had sustained as a result of said contamination."

Numerous definitions and distinctions have been given by the text-book writers and by the courts, as to what does and what does not constitute an accident under various legal and factual situations.

"Whatever may be the difficulties in giving a definition of universal application, it may safely be said that in the legal contemplation of an accident some violence, casualty, or vis major is necessarily involved". 1 C.J.S., Accident, page 432.

In Taylor Dredging Co. v. Travelers Ins. Co. of Hartford, Conn., 2 Cir., 90 F.2d 449, 450, the court stated:

"The notion of an accidental cause is not susceptible of precise definition, though it has been stated that it must partake of an unexpected or *unforseen* character."

It has been held that when used without restriction or qualification in certain contracts such as indemnity agreements, and generally in the law, the meaning of the word "accident" is broader than the restricted definition of an event happening suddenly and violently. 1 C.J.S., Accident, page 431 (Cumulative Pocket Part) Globe

Indemnity Co. of New York v. Banner Grain Co., 8 Cir., 90 F.2d 774; Farmers Cooperative Soc. No. 1 of Quanah v. Maryland Casualty Co., Tex.Civ.App., 135 S.W. 2d 1033.

And in its more general sense it does not exclude negligence, but is recognized as an occurrence arising from the carelessness of men. 1 C.J.S., Accident, page 439; Honeycutt v. Louis Pizitz Dry Goods Co., 235 Ala. 507, 180 So. 91.

In Henderson v. Travelers' Insurance Co., 262 Mass. 522, 160 N.E. 415, 416, 56 A.L.R. 1088, the court said:

"'Accident' * * * is a more comprehensive term than 'negligence,' and in its common significance the word means an unexpected happening without intention or design."

It is also generally held that an effect which is the natural and probable consequence of an act or cause of action is not an accident. Prudential Casualty Co. v. Curry, 10 Ala.App. 642, 65 So. 852; Hardware Mutual Casualty Co. v. Gerrits, Fla., 65 So.2d 69.

Or, as stated by the court in United States Mutual Accident Association v. Barry, 131 U.S. 100, 9 S.Ct. 755, 762, 33 L.Ed. 60:

"If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means."

In the case of Viking Automatic Sprinkler Co. v. Pacific Indemnity Co., 19 Wash. 2d 294, 142 P.2d 394, the court held that negligence, unattended by accidental means, would not entitle the insured to recover on a liability policy under an endorsement insuring against loss as the result of an "accident."

We are of the opinion the damage to the well was not sustained as the result of an accident, but was caused by plaintiff's negligence in failing to retighten the connecting nut at the union, unattended by any accidental cause, and the result that followed was the natural and probable consequence of such negligent act.

Reversed and remanded.

## After Remandment

PRICE, Judge.

On certiorari the Supreme Court held that we were in error in holding that the "'damage to the well was not sustained as the result of an accident,'" and the case was remanded to this court for further consideration.

In our original opinion, under the conclusion reached, we deemed it unnecessary to respond to the second question presented, i. e. whether liability was excluded from the coverage of the policy, hence we did not set out the stipulation as to the facts relating to that question. The stipulation is:

"That the letters 'N. O. C.' following the word 'plumbing' mean in insurance parlance 'not otherwise classified'; that the code No. 3434 merely prescribed the premium rate; that at the end of the quarter ending with the month of September, 1948, plaintiff reported to the defendant the wages paid by him on this job, along with other jobs; that defendant submitted to plaintiff at the end of the quarter referred to a statement for premiums for the quarter; that such wages were used in computing the premium for the quarter; that at the beginning of the policy year plaintiff made a deposit to cover premiums; that the amount of the accrued premiums was charged against this deposit; that plaintiff had been carrying this same type of policy for at least ten years; that the policy No. PL 5450 attached at the end of this stipulation is the policy issued to plaintiff; that on July 9, 1948, the plaintiff moved all workmen and equipment from the premises in question and so far as he knew at the time had fully performed his said contract; that plaintiff did not know

at the time of the act or omission which was later found as above stated to have caused the damage to the well; that the presence of plaintiff and his workmen on the premises through July 9, 1948, was only for the purpose of performing said contract; that said premises were not owned by plaintiff at any time; that the last operation on July 9, 1948, was connecting the nut at the union (the improper connection of which caused the damage) and recovering the union in the pipe with earth, all of which took about fifteen minutes."

The policy issued by defendant to plaintiff is a printed form manufacturers and contractors general liability policy. It contained six definitions of hazards, among which are the following:

"Division 1(a) Operations and premises (Manufacturers and Contractors). All operations during the policy period which are necessary or incidental to the ownership, maintenance or use of the premises. * * * Division 4. Products. The handling or use of or the existence of any condition in goods or products manufactured, sold, handled or distributed by the insured, if the accident occurs after the insured had relinquished possession thereof to others and away from the premises owned, rented or controlled by the insured, and operations covered under divisions 1 (a), 1(b) and 3 of the Definitions of Hazards, other than pick-up and delivery (except misdelivery) and existence of tools, uninstalled equipment and abandoned or unused materials, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof and away from premises, owned, rented or controlled by the insured."

The form contained the statement that: "The insurance afforded is only with respect to such and so many of the following coverages and divisions thereunder as are indicated by entries of the 'yes' in the appropriate column set forth below and the insertion as a. specific premium charge of charges in item 5 of the Declaration." As to all except 1(a) of division of hazards, the notation is "none."

It thus appears from the policy that only division 1(a) of those hazards comes within the coverage.

Item 5, under Declarations, is entitled:

" 'Classifications—operations — Purposes of use—'

"Directly under this item, it is recited:

" '1(a) Operations—Premises (Manufacturers and Contractors)—See Attached Schedule.' "

The schedule attached lists seventeen separate operations, one of which is:

" 'Plumbing—N. O. C.—Gas, steam, hot water or other pipe fitting—including house connections, shop and retail stores or display rooms.' "

The policy provides under "Exclusions:" "This policy does not apply: * * * (d) under Divisions 1(a), 1(b) and 3 of the definition of Hazards, to liability with respect to which insurance is or can be afforded under Division 4 of the Definition of Hazards; or to operations on or from other premises which are owned, rented or controlled by the insured;" and under division 4, quoted above, it appears that operations covered under 1(a) (other than pick-up and delivery and the existence of tools, uninstalled equipment and abandoned or unused materials) do not include an accident which occurs after such operations have been completed or abandoned at the place of occurrence thereof and away from the insured's premises, as such coverage may be obtained under division 4 on payment of a separate premium charge therefor.

■ When read together the above provisions disclose that the insurer has assumed the obligation to pay on behalf of the insured all sums which insured shall become obligated to pay caused by accident, within the scope of division 1(a) of the definitions of hazards, but not for accidents within the scope of division 4 for which a separate premium charge is provided. The policy also provides that liability for an accident which occurs after operations away from the insured's prem-

ises have been either "completed or abandoned" is a coverage available under division 4 and is therefore not included under division 1(a). Since the insured is covered only under division 1(a), it necessarily follows that if the alleged accident occurred after insured's operations had been "completed or abandoned" there would be no liability under the policy. We have paraphrased from and used much of the language set out in, Baker v. Maryland Casualty Co., 73 R.I. 411, 56 A.2d 920, 922, the provisions there being for all practical purposes identical to the provisions in the policy involved here.

In the Baker case, supra, the insured was engaged in the business of cleaning cesspools. On March 17, 1944, she cleaned the cesspool on premises belonging to a Mr. and Mrs. Winkler. Later, on March 24, 1944, as a part of the job, she delivered to the premises a hundred pound carboy of acid which her employees poured into an overflow cesspool from which a cover was removed and immediately thereafter replaced. Her employees then left the premises and no further operations of any kind in connection with the cleaning of the cesspool were conducted by the plaintiff on the premises, nor were any tools or materials belonging to her and used in that cleaning operation left thereon.

On October 5, 1944, the Winklers brought action against the plaintiff in which they alleged that the cesspool cover was so negligently and carelessly replaced that it was rendered unsafe to walk upon and as a result thereof Pearl Winkler, in April, 1944, fell into the cesspool and was severely injured.

The court held: "The policy here definitely excludes coverage for accidents occurring after the plaintiff had 'completed or abandoned' her work on the Winklers' premises. It is manifest from the evidence that plaintiff [insured] herself considered * * * that she had completed her work there after her employees had left the premises on March 24, 1944. Whether she had completed her work to the satisfaction of the Winklers so as to be entitled to payment therefor is of no importance in

this litigation. For the purpose of this case we have to consider only whether the plaintiff had completed her work on March 24, 1944, and had actually discontinued all further operations on the Winklers' premises after that date.

"Under the exclusionary provision of division 3 of the policy [Division 4 of the policy before us] an accident occurring after the premises are abandoned is not covered by division 1. There can be no question that plaintiff abandoned operations on the Winklers' premises after she had satisfied herself on March 24, 1944, that no further operations on her part were required to complete the work which she had contracted to do on such premises. The evidence on that question is undisputed. An accident occurring after that date would therefore not fall within the plaintiff's contract of insurance."

In Smith v. United States Fidelity & Guaranty Co., 142 Neb. 321, 6 N.W.2d 81, 82, the court held that an accident resulting in injury to a motorist which occurred after insured had completed installation of a culvert and had removed all equipment from the scene of the work was not within the coverage of a contractor's public liability policy imposing on insurer the duty to defend against claims for accident occurring " 'during the progress of the work.' " The policy excluded coverage for loss from liability " '(4) Caused by accidents occurring after the final completion of the work performed by the Assured at the place of occurrence of such accidents.' "

In Standard Accident Ins. Co. v. Roberts, 8 Cir., 132 F.2d 794, the insured was in the business of the sale and installation of furniture and fixtures. He sold and installed a gas operated refrigerator in the residence of Clyde Primm. The installation was completed by connecting the refrigerator to the gas pipes in the house. During the night following the day of the installation Primm and his family were injured by gas escaping from the refrigerator connections. The policy provisions were similar to those here under consideration. The court held that since the accident happened after the installation had

been completed and the refrigerator as installed turned over for use by Primm, there was no liability under the policy.

We are of the opinion the last quoted provision under Division 4 excludes the occurrence here from coverage because it was an operation covered under division 1(a) of the Definition of Hazards, and the accident occurred after the operations were completed or abandoned at the place of occurrence, therefore we need not determine whether the operations performed was an insurable risk under the first provision of Division 4 as to "The handling or use of or the existence of any condition in goods or products manufactured, sold, handled or distributed by the insured."

Although our Supreme Court, in determining that the incident involved here was an accident, quoted with approval from Berger Bros. Electric Motors, Inc., v. New Amsterdam Casualty Co., 267 App.Div. 333, 46 N.Y.S.2d 64, that: " 'The whole group of events, beginning with the improper hitching of the motors and ending with the damage inflicted on Chillson's turkey eggs and on his turkeys was an accident, not in one of its phases but in all of them' ", the court did not have under consideration the policy provisions, and we think it was not intended to fix the time of the accident within the meaning of the policy, in view of the fact that in the Berger case, supra, the Court of Appeals of New York in reversing the judgment of the appellate division, 293 N.Y. 523, 58 N.E.2d 717, 718, said:

"When the plaintiff completed its work and removed all of its tools, equipment and materials from the Chillson farm on December 23, 1940, no accident had occurred. Nothing had happened. There was no mishap whatever. Not until the eggs were placed in the incubators did any accident occur, and if we assume, as the plaintiff contends, that the accident did occur on February 20, 1941, 'when the cause and effect merged into a consummated accident', this accident resulted from defective workmanship after the work of the installation was completed. This must be so unless we yield to the plaintiff's contention and hold that the work was not completed at that time because the wiring was defective; but so to construe the language of the excluding clauses would deprive them of all meaning and purpose. By these clauses the parties intended to limit the casualty company's liability to accidents occurring during the progress of the work and to exclude liability for accidents occurring, after the work was completed, as the result of defective workmanship. If that be not the meaning of the plain language used, the insurer would remain liable indefinitely for defective workmanship upon the theory that defective work is never complete until the defect is discovered and corrected. But this is a risk which the parties intended to exclude from the coverage of the policy, and we cannot read these policies as intended to cover such risks, for the language is plain and unambiguous."

Applying the facts here to the law as set out in the foregoing decisions we conclude that the damage to the well occurred after the operations of insured had been "completed or abandoned" and it was not within the coverage of the policy.

The attached "Schedule of Operations," issued contemporaneously with the policy, lists a column of classifications with code numbers prescribing the premium rate, premium bases, rate per $100 of remuneration, estimated premiums, minimum premiums, total advance premium for policy. It recites, "Attached to and forming a part of Policy No. Pl–5450 issued to Rives Construction Company."

"It is well settled that 'Two or more instruments executed contemporaneously by the same parties in reference to the same subject-matter constitute one contract.' 5 Ala.Dig.Contracts, ⊜164 [page 71]; Hunter-Benn & Company v. Bassett Lumber Co., 224 Ala. 215, 139 So. 348." McCord v. Travelers Ins. Co., 244 Ala. 164, 12 So.2d 413, 415.

We find no inconsistency or conflict between the general provisions of the policy and the "Schedule of Operations," and we do not accord merit to appellee's contention in brief that the underlined words in the following statement in the attached "Sched-

**418**

tle of Operations:" "Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, agreements or limitations of the undermentioned policy, *other than as above stated,*" clearly show it was the "intention of the parties to modify and extend the contract by the schedule of the operations to the extent recited in the schedule. * * * the general provisions of the policy found in Division 4 of the Definitions of Hazards and exclusion (d) under Exclusions are not applicable, in view of the attached schedule of operations."

The judgment of the trial court is reversed and the cause remanded.

Reversed and remanded.