[S. F. No. 22259. In Bank. Nov. 14, 1967.]

INSURANCE COMPANY OF NORTH AMERICA, Plaintiff and Appellant, v. ELECTRONIC PURIFICATION COMPANY, INC. et al., Defendants and Respondents.

Popelka, Graham, Hanifin, Van Loucks & Allard and H. T. Faaland for Plaintiff and Appellant.

Harold A. Parichan and R. W. Levy for Defendants and Respondents.

TOBRINER, J.—This appeal is from a judgment in a declaratory relief action in which the court ordered plaintiff Insurance Company of North America to defend its insured, defendant Electronic Purification Company, Inc., in a wrongful death action, and, subject to the limits of its policy, to pay any judgment rendered against the insured in that action. The insurer urges that by reason of a products hazard exclusion in its policy it owes no obligation to the insured in regard to the subject matter of the wrongful death action.

We hold that the products hazard exclusion does not apply to this case. Two independent and alternative grounds support this result: first, the very language of the exclusion does not embrace a product, or operations involving a product, which has been "rented . . . but not sold," and here the involved product, a water purification device, had been rented but not sold; second, the complaint in the wrongful death action alleges as the cause of death negligent performance of pool cleaning work, which constitutes a service, not an operation related to a product, and thus is not within the product's hazard exclusion. The products hazard clause would, if loosely interpreted to cover the service involved in the instant case, eliminate coverage which the ordinary businessman would under the circumstances reasonably expect from this policy. As we shall point out, neither the language of the policy nor the principles announced in the cases compel that elimination.[1]

Electronic engaged in the business of selling, leasing, and installing water purification machines, called Nion generators, which were manufactured by Aladdin Electronics. Mel Seals served as a part-time employee in the capacity of salesman and installed most of the Nion generators for Electronic. Seals' principal occupation was that of policeman; he also operated out of his home his own pool servicing business.

Defendants Robert and Mary Puccinelli, who owned the Canal Farm Inn and Motel, leased a Nion generator from Electronic for use in connection with their motel swimming pool. The lease ran for a term of one year, and provided for the payment of rent in monthly installments. By the terms of

---

[1]The trial court based its finding of coverage primarily on the theory that Electronic owed a continuing obligation under the lease, particularly in regard to maintenance of the Nion generator, and therefore its operation was not completed so as to bring it under the exclusion of completed operations. Because we reach the same result for other reasons, we express no view on this theory.

the lease, Electronic agreed to make all repairs and replacements to the Nion generator at its own cost, except those caused by misuse; it retained the right to make inspections, repairs, and replacements at reasonable times. It was not, however, required to undertake the inspections. The Puccinellis agreed to advise Electronic when the Nion generator was not functioning.

Because the walls of the motel pool were plagued with unsightly black algae, Electronic suggested to the Puccinellis that Seals, who was to install the Nion generator, be engaged to clean and acid-wash the pool prior to installation. Although the proper functioning of the Nion generator, which was designed to purify the water, did not require the acid-washing, the washing would contribute to the desired aesthetic result. Electronic usually billed the customer for Seals' acid-washing service when performed in connection with the installation of a Nion generator.

Seals and his assistant, Fred Call, acid-washed the pool and installed the Nion generator over a three-day period. On the second day, Seals and Call, working late in the evening with the pool drained of water, used the underwater light in the pool to enable them to see what they were doing. The light, which should have been cooled by the water, blew out; the next morning they replaced it. By noon of that day they had completed the acid-washing work. Call left the job; Seals installed the Nion generator and filled the pool with water.

The next day Kevin Thompson, a 12-year-old guest at the motel, sustained a fatal electric shock while swimming in the motel pool. Thereafter, his parents filed a complaint for wrongful death naming Electronic and the Puccinellis as defendants and alleging that they "negligently, carelessly and recklessly maintained and installed the electric wiring leading to the submerged pool floodlight fixture . . . in such a way as to cause the said submerged pool floodlight fixture to become highly charged with electricity along its frame and exterior surfaces . . . Kevin Thompson entered said swimming pool and while engaged in swimming therein a portion of his body came in contact with one of the objects appurtenant and affixed to the said [swimming] pool, and . . . received into his body a deadly electric shock. . . ."

At the time of Kevin Thompson's death Electronic carried a comprehensive multiple liability policy undertaken by plaintiff insurer. Plaintiff originally issued the policy to Scott

and Evelyn Moore doing business as Central California Oral Ceramics Studio. By subsequent endorsement in consideration of an additional premium to be determined by audit, the business name of Scott and Evelyn Moore was amended to add Electronic Purification Company. The endorsement likewise added a new classification of the insured's business as "Installation of 'Nion Generators' " followed by language which we set out *in haec verba infra* (see fn. 5). The parties attached the typewritten special endorsement to the policy and caused the changes to be handwritten on the declarations page of the policy.

The policy sets out the general coverage involved here in a single sentence under the general heading "Comprehensive Liability Insurance" and the subheading "Insuring Agreements."[2] That sentence declares that the insurer agrees with the insured *"To pay* on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person." The insurer further agrees to defend any suit against the insured involving such injury. The policy provides similar coverages for property damage, caused either by automobile or otherwise.

Under the subheading of "Exclusions," the policy sets out situations in which it does not apply; under another subheading, "Conditions," the policy lists Condition 3(g),[3] which,

[2]The policy is not easy to decipher. It consists of a package of papers, some 21 in number, two of which, composed of both sides of four pages, comprise the available insuring agreements, exclusions, and conditions. These pages, apparently the heart of the policy, are preceded by four others that purport to identify from among those available the coverages purchased by the particular policy.

[3]The condition reads: "Products Hazard. The term 'products hazard' means

(1) goods or products manufactured, sold, handled or distributed by the named *insured* or by others trading under his name, if the occurrence or accident takes place after possession of such goods or products has been relinquished to others by the named *insured* or by others trading under his name and if such occurrence or accident takes place away from premises owned, rented or controlled by the named *insured*, provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, *rented* to or located for use of others but not sold;

(2) *operations,* if the occurrence or accident takes place *after such operations have been completed* or abandoned and takes place away from premises owned, rented or controlled by the named *insured*; provided, operations shall not be deemed incomplete because improperly or defec-

the insurer asserts, establishes the non-coverage of the policy in this case. A schedule attached to the policy[4] purports to isolate and limit the coverages provided from those available. Under the heading "Description of Hazards" and subheading "(a) premises—operations" the policy describes the business of Electronic as set out in the margin.[5] Except for the omission of the italicized language, the description parallels that on the special endorsement.

tively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the *insured*, (c) the existence of tools, uninstalled equipment and abandoned or unused materials." (Some italics added.)

[4]The schedule reads:

"DIVISION I—COMPREHENSIVE LIABILITY INSURANCE

| "COVERAGES | LIMITS OF LIABILITY |
|---|---|
| A—Bodily Injury Liability | $100,000 each person<br>$300,000 each occurrence<br>*$ NOT APPLICABLE aggregate products |
| B—Property Damage Liability—<br>Automobile | $ 25,000 each accident |
| C—*Property Damage Liability—*<br>Except Automobile | $ 5,000 each accident<br>$ 25,000 aggregate operations<br>$ 25,000 aggregate protective<br>*$ NOT APPLICABLE aggregate products<br>$ 25,000 aggregate contractual |

Endorsements attached to policy at inception D1078, LC346, D1189 & D1190.

END #3

[5]The section reads: "*Installation of 'Nion Generators' rated as*: Plumbing—N.O.C.—Gas, Steam, Hot Water or other Pipe Fitting—including House Connections, Shop and Retail Stores or Display Rooms. Code 3434u." Plaintiff informs us that " 'N.O.C.' is a rating term used by insurance underwriters when a certain business activity of an insured (such as installation of Nion generators) is not mentioned specifically in underwriting rating tables. In such instances, the underwriter will use a broad category (such as plumbing was used here) and add the term 'N.O.C.' " (See *Standard Acc. Ins. Co.* v. *Roberts* (8th Cir. 1942) 132 F.2d 794, 797 fn. 2; *Employers Ins. Co. of Alabama* v. *Rives* (1953) 38 Ala.App. 411 [87 So.2d 646, 649].)

*The words 'not applicable' shall mean that insurance is not afforded with respect to the 'products hazard' as defined in condition 3(g) of DIVISION I of the policy."

Although the "Products Hazard" condition excludes coverage of the risks which it specifically describes, it does *not* exclude coverage of the risks which it does not describe and which otherwise fall under the general coverage of the policy. Both insured and insurer agree that the products hazard provision constitutes extra coverage in return for the additional premium which it requires. Hence if the insured did not purchase it and the loss falls under the risks specified within it, the insurer is not liable. By the same token the insurer is liable for a loss that falls outside the language of the clause and lies within the general coverage of the policy. We shall point out that the fatality in this case, which lies within the general coverage of the policy, is not one of the risks specified by the products hazard condition.

## I.

The products hazard provision contains two parts, part (1) dealing with "goods or products manufactured, sold, handled or distributed by the named insured," defined not to include "any property . . . rented to or located for use of others but not sold," and part (2) dealing with "operations." We analyze the present issue in the light of the two-pronged provision of the exclusion, one relating to "products" and the other relating to "operations." We explain that the language of non-application of the exclusion as to rented products applies to both aspects of the provision.

The testimony at the trial of this case showed that defects in the product, the Nion generator, could possibly have caused the electrocution of Kevin Thompson. If the compressor in the machine failed to operate, water could back up into a sealed grid, cause a short circuit, and conduct electricity into the swimming pool. If the Nion generator were the cause of the electrocution, the products hazard exclusion, which provides that it does not apply to *rented* products, would be inapplicable. Since, as we have pointed out, Electronic leased the Nion generator to the Puccinellis, the exclusion would not apply, and the loss would be covered by the policy.

The insurer argues, however, that the exclusion of rented products from the products hazard provision contemplated an absolute exclusion from any coverage whatsoever under the policy, and that additional protection must be purchased to insure a risk of liability related to rented goods. The policy,

however, contains no provision to that effect; to the contrary, the policy is a comprehensive multiple liability policy stating that the insurer agrees "to pay . . . all sums which the insured shall become obligated to pay as damages because of bodily injury." The exception of an item from an exclusion leaves it under the general coverage, unless it is elsewhere generally excluded. Among the myriad provisions of the policy we find none specifically relating to rented products. We conclude that since rented products are excepted from the products hazard exclusion they come within the general coverage. At best, the insurer's argument does no more than raise a possible ambiguity in the policy, and such ambiguity, of course, must be resolved in favor of the insured.

An alternative theory of liability, which indeed is advanced by the wrongful death complaint as the principal ground for recovery, urges that the death did not result from a defect in the Nion generator but from the negligence of Seals and Call in repairing the underwater floodlight. In that case, not a product, but arguably an "operation" caused the electrocution. We shall point out that the rental exception likewise applies to the "operations" subdivision.

Although the "goods or products" portion of the exclusion and the "operations" portion are set out in separate subdivisions, they must be read together to apply only to the same subject matter, that is, to *products that are sold and not rented*. The "operations" subdivision, therefore, pertains only to operations closely connected with a non-rented product and not to purely service operations. ▮ " ' [O]perations' refers to workmanship on products. Any hazard with relation to products is excluded because it is the manufacturer's responsibility." (*Gehrlein Tire Co.* v. *American Employers Ins. Co.* (W.D.Pa. 1964) 243 F.Supp. 577, 581, affd. (3d Cir. 1965) 348 F.2d 918.)[6]

---

[6] "We are not persuaded that the average businessman would be unreasonable or lacking in understanding in assuming that the caption phrase 'Products—Completed Operations' related to the subject of products liability and that the subdivisions thereof were both germane to such subject. In any event, we are of the opinion that the District Judge was justified in finding ambiguity in the phrase and resolving it against the phrase's author." (*McNally* v. *American States Ins. Co.* (6th Cir. 1962) 308 F.2d 438, 443. See also *Bituminous Cas. Corp.* v. *R & O Elevator Co.* (8th Cir. 1961) 293 F.2d 179; *Hoffman & Klemperer Co.* v. *Ocean Acc. & Guar. Corp.* (7th Cir. 1961) 292 F.2d 324, 329; *Ocean Acc. & Guar. Corp.* v. *Aconomy Erectors, Inc.* (7th Cir. 1955) 224 F.2d 242, 247-248; *Nielson* v. *Travelers Indemn. Co.* (N.D. Iowa 1959) 174 F.Supp. 648, 654, affd. (8th Cir. 1960) 277 F.2d 455; *Hercules Co.* v. *Royal Indemn.*

The language of the policy compels such a reading. The exclusion bears the heading in bold face: "Products Hazard," and begins, "The term *products* hazard' means. . . ." (Italics added.) That introductory clause must refer to both the "goods and products" subdivision as well as the "operations" subdivision. Both are indented under that same heading and separated by only a semicolon. The "operations" subdivision starts with an uncapitalized letter, and unless the introductory clause applies to it as well as to the first subdivision, it is stranded as an incomplete sentence without subject or verb.

Unless the subdivisions both relate to products, no reason justifies their joinder under a single heading. Moreover, coverage under one subdivision cannot be purchased independently of the other.

If, however, we should interpret the policy as providing that subdivision (2) does not relate to subdivision (1) and does not refer to the products described in subdivision (1), the section would present a fatal ambiguity. If subdivision (2) eliminated coverage for completed general operations, not related to products, as the insurer urges, it would involve a subject utterly unrelated to products which no ordinary insured would expect to find under the heading, "Products Hazard."

The declarations page, where the exclusion is noted, further discloses that both subdivisions relate only to products. The words "not applicable" are written over the box labeled simply "aggregate *products*" and the footnote provides that "The words 'not applicable' shall mean that insurance is not afforded with respect to the '*products hazard*' as defined in condition 3(g). . . ." (Italics added.)

These considerations compel the interpretation of the "operations" subdivision as applicable only to operations involving a product as defined in the policy. Since the defini-

Co. (S.D.N.Y. 1959) 171 F. Supp. 746, 748; *Miller Elec. Co.* v. *Employers' Liab. Assur. Corp.* (Fla.App. 1965) 171 So.2d 40, 48; *New Amsterdam Cas. Co.* v. *Addison* (Fla.App. 1964) 169 So.2d 877, 881-882; *Maretti* v. *Midland Nat. Ins. Co.* (1963) 42 Ill.App.2d 17 [190 N.E.2d 597, 601]; *King* v. *Mason* (La.App. 1957) 95 So.2d 705, 718, affd. (1958) 234 La. 299 [99 So.2d 117]; *Rafiner Elevator Works, Inc.* v. *Michigan Mut. Liab. Co.* (Mo. 1965) 392 S.W.2d 240, 242; *Kissel* v. *Aetna Cas. & Sur. Co.* (Mo.App. 1964) 380 S.W.2d 497, 506; *Peerless Ins. Co.* v. *Clough* (1963) 105 N.H. 76 [193 A.2d 444, 448-449]; *Inductotherm Corp.* v. *New Jersey Mfrs. Cas. Ins. Co.* (1964) 83 N.J.Super. 464 [200 A.2d 358, 364].)

tion of product does not include rented property and since the only property with which the operations could arguably be connected is the leased Nion generator, the exclusion of products hazard does not apply to the instant fatality.

## II.

We turn to a second and independent theory upon which the liability of the insurer could rest. Upon the hypothesis that negligence in replacing the floodlight caused the electrocution of the boy, liability would stem from the improper performance of the cleaning work, a service which, we point out, does not fall under the products hazard exclusion. We explain that the acid-washing of the pool was sufficiently disconnected from the installation of the Nion generator as not to constitute a "completed operation" related to a product as described in the exclusion. The acid-washing therefore fell within the coverage of the policy.

The genesis of the products hazard exclusion apparently lies in the broad potentialities for injury from products possessing inherent hazards and in the doctrine of strict liability for defective products, against which insurers sought to protect themselves. (*Nielson* v. *Travelers Indemn. Co., supra,* 174 F.Supp. 648, 652-653, affd. (8th Cir. 1960) 277 F.2d 455; 7A Appleman, Insurance Law & Practice (1942) § 4508; Arnold, *Products Liability Insurance* (1958) 25 Ins. Counsel J. 42.) Yet the distinction which the provision attempts to draw between "completed" and "uncompleted" operations establishes only an arbitrary point at which the responsibility of the insurer ceases even though the liability of the insured does not. Since the policy nowhere defines the term "operations," the direction and dimensions of the distinction are obscure.

These characteristics of the products hazard exclusion undoubtedly account for its tortuous history in judicial decision. Its complex composition and its arbitrary bifurcation of "completed" from "uncompleted" operations have invited the skepticism of courts. In interpreting it courts have been guided by the principle that the exclusion should not be given so wide a swath that it cuts away the very insurance which the ordinary businessman would expect under the policy. These courts have looked at all the relevant circumstances, including the disclosed nature of the business of the insured, to determine the nature of the exclusion. In so doing they follow the

general principle that they should not interpret the provision "to remove from the coverage of the policy a risk against which the circumstances under which and the purposes for which the policy was written indicate the insured intended to protect himself . . . ." (*Meyer* v. *Pacific Employers Ins. Co.* (1965) 233 Cal.App.2d 321, 328 [43 Cal.Rptr. 542].)[7]

As this court has said, "Contracts of insurance should be viewed in the light of their general objects and purposes, including the legitimate conditions prescribed by the insurer. . . . In general, the object and purpose of insurance is to indemnify the insured in case of loss, and ordinarily such indemnity should be effectuated rather than defeated. . . . An insured is entitled to the protection which he buys and for which he pays substantial premiums." (*Glickman* v. *New York Life Ins. Co.* (1940) 16 Cal.2d 626, 634-635 [107 P.2d 252, 131 A.L.R. 1292]; see generally, Meyer, *Contracts of Adhesion and the Doctrine of Fundamental Breach* (1964) 50 Va.L.Rev. 1178.)

When confronted with products hazard clauses, many courts, troubled by the difficulty of ascertaining their meaning, have warned against interpreting them to deny the basic insurance contemplated by the insured. "In summary, the plaintiff gave the defendant coverage in a single, simple sentence easily understood by the common man in the market place. It attempted to take away a portion of this same coverage in paragraphs and language which even a lawyer, be he

---

[7]See, e.g., *Port Blakely Mill Co.* v. *Springfield Fire & Marine Ins. Co.* (1910) 59 Wash. 501, 506 [110 P. 36, 140 Am.St.Rep. 863, 28 L.R.A. N.S. 596]. "Hence, the courts in the field of insurance contracts have tended to require that the insurer render the basic insurance protection which it has held out to the insured." (*Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 280 [54 Cal.Rptr. 105, 419 P.2d 168].) "It appears clear to us that when plaintiffs purchased the comprehensive general liability policy relied on by them for recovery in this case, they meant to purchase and obtain general contractors protection against comprehensive claims arising out of their work and services in the performance of building . . . ." (*Kissel* v. *Aetna Cas. & Sur. Co., supra*, 380 S.W.2d 497, 506.) "There emerges through the confusion [of the policy] only one clear intention, that is, that the insurance company agreed to insure against risks incidental to the exhibition of fireworks. We construe the policy as covering liability for all accidents arising from the insured's operations, whether the accident happened during or after the exhibition was completed." (*Marotti* v. *Midland Nat. Ins. Co., supra*, 190 N.E.2d 597, 602; see also, *Bituminous Cas. Corp.* v. *R & O Elevator Co., supra*, 293 F.2d 179, 185; *Nielson* v. *Travelers Indemn. Co., supra*, 174 F.Supp. 648, 662, affd. (8th Cir. 1960) 277 F.2d 455; *Ocean Acc. & Guar. Corp.* v. *Aconomy Erectors, Inc., supra*, 224 F.2d 242, 247; *Peerless Ins. Co.* v. *Clough, supra*, 193 A.2d 444, 448.)

from Philadelphia or Bungy, would find it difficult to comprehend." (*Peerless Ins. Co.* v. *Clough, supra,* 193 A.2d 444, 449.) "The true meaning of the policy is difficult to determine. An examination of it involves a physical effort of no mean proportions. . . . If [the reader] is possessed of reasonable physical dexterity, coupled with average mental capacity, he may then attempt to integrate and harmonize the dubious meanings to be found in this not inconsiderable package. A confused attempt to set forth an insuring agreement is later assailed by such a bewildering array of exclusions, definitions and conditions, that the result is confounding . . . ." (*Ocean Acc. & Guar. Corp.* v. *Aconomy Erectors, Inc., supra,* 224 F.2d 242, 247; *Maretti* v. *Midland Nat. Ins. Co., supra,* 190 N.E.2d 597, 602.)

A wide and sweeping interpretation of the products hazard clause would eliminate practically all meaningful insurance for Electronic. Since all of its business is connected in a broad sense with the Nion generator, the insured would then be protected from losses only if they occur before Electronic has completed its operations. The principles and precedents set out above enjoin us from an interpretation of the clause so loose that it would include an operation which only remotely relates to the product. Such an interpretation would destroy the insured's principal objective in purchasing insurance.

On the facts of this case, we believe the acid-washing to be sufficiently remote from the product as not to be included within any proper definition of "operations." Operations sufficiently closely connected with the product might include, for example, installation of the Nion generator at the site or adjustments to it that might be necessary in order that it function properly. The acid-washing work does not come within this category. It relates to the Nion generator only in that the common purpose of both is the maintenance of a clean, healthy swimming pool. The Nion generator could function as well with or without the algae. The acid-washing is a service independent of the Nion generator that Electronic makes available to its customers because of their mutual interest in achieving optimum sanitary conditions in the pool. Such a function proceeds beyond Electronic's obligations in regard to its product, offering to its clients a further service not within the products hazard exclusion for completed operations.

The cases regularly hold that since the completed operations provision must be read to apply only to operations involving a *product,* it does not apply to an insured's business if it involves services only, or if the product composes but a minimal part of the business.[8]     Similarly, if the business of the insured may be severed into operations not related to a product, only those operations that do involve a product are subject to the completed operations exclusion.[9]     In the present case, the installation of the Nion generator and the acid-washing are severable operations for the reasons discussed; they are not mutually dependent: either can be performed without the other and they need not be performed at the same time nor by the same person.[10]

Thus we conclude that the products hazard clause does not embrace a service which is only remotely related to a product. To give the provision a wider sweep would do violence to its very language. It would also do violence to the principle announced by the cases: that the policy should be so interpreted as to give that protection which the ordinary businessman would expect to acquire under it.

The instant case presents yet another illustration of the dangers of the present complex structuring of insurance policies. Unfortunately the insurance industry has become addicted to the practice of building into policies one condition or exception upon another in the shape of a linguistic Tower of Babel. We join other courts in decrying a trend which both plunges the insured into a state of uncertainty and burdens the judiciary with the task of resolving it. We reiterate our

[8]See *Hoffman & Klemperer Co.* v. *Ocean Acc. & Guar. Corp., supra,* 292 F.2d 324, 328-329; *Nielson* v. *Travelers Indemn. Co., supra,* 174 F.Supp. 648, 656-662, affd. (8th Cir. 1960) 277 F.2d 455; *Hercules Co.* v. *Royal Indemn. Co., supra,* 171 F.Supp. 746, 748; *Miller Elec. Co.* v. *Employers' Liab. Assur. Corp., supra,* 171 So.2d 40, 48; *Maretti* v. *Midland Nat. Ins. Co., supra,* 190 N.E.2d 597, 601; *King* v. *Mason, supra,* 95 So.2d 705, 718-719, affd. (La. 1958) 99 So.2d 117; *Peerless Ins. Co.* v. *Clough, supra,* 193 A.2d 444, 449.)

[9]See *Gehrlein Tire Co.* v. *American Employers Ins. Co., supra,* 243 F. Supp. 577, 581, affd. (3d Cir. 1965) 348 F.2d 918; *McNally* v. *American States Ins. Co., supra,* 308 F.2d 438, 445-446; *Bituminous Cas. Corp.* v. *R & O Elevator Co., supra,* 293 F.2d 179, 185.

[10]Even though the acid-washing is separate from the Nion generator installation, that fact does not support a contention that the acid-washing was beyond the scope of the business insured. The policy described Electronic's business in a broad classification (see fn. 5, *supra*) and certainly the insurer anticipated that Electronic would provide such incidental services as the acid-washing.

plea for clarity and simplicity in policies that fulfill so important a public service.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.