[Civ. No. 12104. Third Dist. May 26, 1970.]

CONNIE HAYS, Plaintiff and Respondent, v.
PACIFIC INDEMNITY GROUP, Defendant and Appellant.

## COUNSEL

Johnson, Davies & Greve and Claire H. Greve for Defendant and Appellant.

Coshow & Barr, William W. Coshow and John D. Barr for Plaintiff and Respondent.

## OPINION

**REGAN, J.**—In an action (No. 32659) for personal injuries suffered, the Superior Court of Shasta County rendered judgment in the sum of $35,000 together with costs in the sum of $150.48 in favor of plaintiff Connie Hayes and against Jack Liles, individually, and doing business as the Over-

head Door Company of Chico. Thereafter plaintiff brought the present action (No. 36444) against defendant Pacific Indemnity Group predicated upon a contractor's comprehensive liability policy of insurance issued by defendant to Liles who, pursuant to a contract with plaintiff, installed a garage door on plaintiff's premises which, when plaintiff attempted to use the door for the first time, fell upon him. Judgment was rendered in favor of plaintiff and against the defendant insurer.

Defendant insurer declined to undertake the defense of Liles in the first action on the ground the policy afforded no coverage for the incident in question and thus it had no duty to defend.

Prior to the trial of action No. 32659 Liles entered into an agreement with plaintiff Connie Hays pursuant to which Liles agreed to assign to plaintiff any rights which he (Liles) might have against the defendant insurer. Plaintiff agreed that if he recovered judgment against Liles he would not attempt to execute against Liles for any sum greater than $1,500.

Following the entry of judgment in action No. 32659, Liles paid the agreed sum of $1,500 to plaintiff and plaintiff brought the present action.

The trial court found, inter alia, that:

"I

"That the plaintiff was injured as the result of the negligent installation of a garage door by Jack Liles on June 30, 1964.

". . . . . . . . . . . .

"III

"That at the time of the incident, the defendant in this action had issued a comprehensive general liability policy excluding products liability and completed operations to the said Jack Liles.

". . . . . . . . . . . .

"V

"That the said Jack Liles requested and tendered the defense of the action brought by the plaintiff against him to the defendant, PACIFIC INDEMNITY GROUP, and said request and tender was rejected by the defendant, PACIFIC INDEMNITY GROUP.

"VI

"That the said injury occurred as the result of the faulty installation and

workmanship of the said Jack Liles and not due to any faulty product sold by said Jack Liles.

#### "VII

"That the garage door installation by the said Jack Liles was not a completed operation within the terms of the insurance policy issued by the defendant, PACIFIC INDEMNITY GROUP.

#### "VIII

"That the failure of the insurance company to investigate and defend Action No. 32659 contributed to the proximate cause of the loss suffered by Liles in said action."

And as conclusions of law:

#### "I

"That the comprehensive general liability policy issued by the defendants to the said Jack Liles provided coverage to the extent of the policy limits.

#### "II

"That even if the said general comprehensive liability policy did not provide coverage for the said Jack Liles, the defendant had the duty to defend the said Jack Liles and the failure to do so was a breach of contract for which it would be liable for the attorneys' fees, for costs and judgment rendered in Action No. 32659" and rendered judgment as prayed for plus $998.43 as attorneys' fees and costs in action No. 32659.

The pertinent portions of the policy of liability insurance issued to Liles provide as follows:

Endorsement No. 13 reads:

"It is agreed that the policy does not apply to the products hazard as defined therein."

Under "Conditions," the term "products hazard" is defined, in part, to mean:

"(2) operations, if the accident or occurrence occurs after such operations *have been completed or abandoned* and occurs away from premises owned, rented or controlled by the named insured: provided, *operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement* . . . ." (Italics added.)

Also on page 1 of the policy, under coverage for bodily injury, it is specified that "aggregate products" are "NOT COVERED."

The policy, however, is a comprehensive liability policy which agrees, under "Coverage A—Bodily Injury Liability

"To Pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . including death at any time resulting therefrom, sustained by any person," up to the amount specified.

Exclusion of products hazard applies to operations which have not been completed or abandoned. In other words, it would appear to the insured that in installing a products hazard (an automatic door is considered as such), the insured would be entitled to believe that he is insured up to the time of completion of the installation. But then we come to the language that the installation "shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement . . . ." Here, we find an ambiguity. How can an installation be deemed completed when it is incomplete?

The policy is not easy to decipher or understand. It consists of a package of papers some 33 in number composed of agreements, conditions and exclusions. As said in *Insurance Co. of North America* v. *Electronic Purification Co.* (1967) 67 Cal.2d 679, 689-690 [63 Cal.Rptr. 382, 433 P.2d 174], quoting from *Peerless Ins. Co.* v. *Clough* (1963) 105 N.H. 76 [193 A.2d 444, 449], the insurance company gave the insured coverage in relatively simple language easily understood by the common man in the market place, but "attempted to take away a portion of this same coverage in paragraphs and language which even a lawyer, be he from Philadelphia or Bungy, would find it difficult to comprehend."

The insurance contract is a contract of adhesion and as such requires that we recognize the status of the contracting parties, and resolve any ambiguities in favor of the insured. In *The Individual and the Public Service Enterprise in the New Industrial State,* reprinted from 55 California Law Review, No. 5, November 1967, we read: "Contract doctrine, for example, at one time the instrument of transition from status to individualism, may today, if rigidly applied, produce a quite different result. Thus, an individual today does not bargain meaningfully over a union or professional society's constitution and bylaws, an automobile manufacturer's warranty, or an insurance policy. He accepts these as given; they are part of his economic environment. If they are contracts at all, they are 'contracts of adhesion,' imposed on a take-it-or-leave-it basis by the party possessing superior 'bargaining' strength. Rigid reliance upon their terms

as defining legal obligations between the parties may, in effect, produce new forms of subservience under the guise of contract. In such contexts contract law may be said to be undergoing a functional revolution." (P. 1252.)

". . . The important products or services which these enterprises provide, their express or implied representations to the public concerning their products or services, their superior bargaining power, legislative recognition of their public aspect, or a combination of these factors, lead courts to impose on these enterprises obligations to the public and the individuals with whom they deal, reflecting the role which they have assumed, apart from and in some cases despite the existence of a contract. Such obligations flow from status rather than consensual relationships between the parties. In the pages which follow, we attempt to trace the modern development of the public service doctrine, first as applied to unions and professional societies through judicial insistence upon open membership and fair treatment, and then as applied to the relationship between purveyors of goods and services and the consuming public, through insistence that the product or service conform to the reasonable expectations of the public." (P. 1253.)

"[W]hen a party to a transaction 'affected with a public interest' attempts contractually to deny or limit his own liability for negligence, in defiance of the reasonable expectations of the weaker party to the contract, courts may impose obligations by refusing to enforce such clauses. Although they may invoke the language of common law relationships such as bailment, or contract interpretation, or of 'public policy,' the obligation they impose is based in each case on the relationship between the parties rather than on contract." (P. 1272.)

"The concept that a contract is to be interpreted in the light of the parties' reasonable expectations lies deep in contract law. Basically courts have long looked to the language of the contract to find the meaning which the parties reasonably expected from the use of the words. Applying the concept somewhat differently, courts may derive the reasonable expectations of the parties from their relationship or status rather than from the consensual transaction itself. When the public service enterprise is an insurance company dealing with an insurance purchaser who is obviously the weaker party to the transaction, many courts in determining contractual obligations have examined the reasonable expectation of the average insured. Thus, courts have stricken from insurance contracts unclear, unexpected, inconspicuous, or unconscionable limitations of liability which would frustrate the reasonable expectations of the insured. Courts have also refused to enforce clauses which would negate the principal protection which the insured would reasonably expect." (P. 1273.)

■ We hold the product's hazard exclusion as written cannot be applied to exclude the insurer's liability under the facts of this case. The trial court found the injury occurred as the result of "faulty installation and workmanship" and not due to "any faulty product" and was thus the result of a faulty service not a defective product.

The insured Liles testified that upon learning of the injury to plaintiff he believed the insurance policy covered the incident, and we hold, as did the court in *Insurance Co. of North America* v. *Electronic Purification Co., supra,* 67 Cal.2d at page 681, "The products hazard clause would, if loosely interpreted to cover the service involved in the instant case, eliminate coverage which the ordinary businessman would under the circumstances reasonably expect from this policy." That elimination is not not compelled here.

The insured was engaged in the business of installing garage doors on the property of his customers. He testified a job in his specialty is not considered completed "until it is inspected and accepted by either the owner or the general contractor." Should we hold the insured had completed his installation as claimed by appellant, such "a wide and sweeping interpretation . . . would eliminate . . . all meaningful insurance" (see *Insurance Co. of North America* v. *Electronic Purification Co., supra,* 67 Cal.2d at p. 690) for the insured.

We have briefly noted the unequal bargaining power between insurers and insureds and the doctrinal currents in the area of law that require construction of a contract of insurance.

In 83 Harvard Law Review (No. 5, March 1970), page 961, the author of *Insurance Law Rights At Variance With Policy Provisions* notes that in the patterns of decision two broad principles are noted, namely, an insurer will be denied any unconscionable advantage in an insurance transaction and the reasonable expectations of applicants and intended beneficiaries will be honored, stating (at pp. 967-968): "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

" . . . . . . . . . . . .

"[T]hat insurers ought not to be allowed to use qualifications and exceptions from coverage that are inconsistent with the reasonable expectations of the policyholder having an ordinary degree of familiarity with the type of insurance involved," and concluding this ought not to be allowed even though the insurer's form is very explicit and unambiguous because insurers

know that ordinarily policyholders will not in fact read their policies, which cannot be fully understood without detailed study.

Turning now to the refusal of the insurer to undertake the defense of the insured Liles on the ground the policy afforded no coverage for the incident in question and thus it had no duty to defend, we conclude that defendant insurer was obligated to defend the action (No. 32659) which resulted in the money judgment for plaintiff herein.

We do this on the authority of *Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269-271 [54 Cal.Rptr. 104, 419 P.2d 168], where the court said: "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.

"These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract. As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standarized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take it or leave it' basis carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.

"Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect. Thus as Kessler stated in his classic article on adhesion contracts: 'In dealing with standardized contracts courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's "calling", and to what extent the stronger party disappointed reasonable expectations based on the typical life situation.' (Kessler, *Contracts of Adhesion* (1943) 43 Colum.L.Rev. 629, 637.)

"Professor Patterson, in describing one characteristic consequence of 'the conception of adhesion, whether that term is used or not,' writes: 'The court interprets the form contract to mean what a reasonable buyer would expect it to mean, and thus protects the weaker party's expectation at the

expense of the stronger's. This process of interpretation was used many years ago in interpreting (or construing) insurance contracts. . . .' (Fn. omitted; Patterson, *The Interpretation and Construction of Contracts* (1964) 64 Colum.L.Rev. 833, 858.)

"Thus we held in *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, that we would not enforce an exclusionary clause in an insurance contract which was unclear, saying: 'If [the insurer] deals with the public upon a mass basis, the notice of noncoverage of the policy, in a situation in which the public may reasonably expect coverage, must be conspicious, plain and clear.' (P. 878.)" (Fns. omitted; pp. 269-271.)

"The insured is unhappily surrounded by concentric circles of uncertainty: the first, the unascertainable nature of the insurer's duty to defend; the second, the unknown effect of the provision that the insurer must defend even a groundless, false or fraudulent claim; the third, the uncertain extent of the indemnification coverage. Since we must resolve uncertainties in favor of the insured and interpret the policy provisions according to the layman's reasonable expectations, and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that such obligation is independent of the indemnification coverage." (Fn. omitted; *id.* at pp. 273-274.)

*Gray, supra,* pointed out (at p. 275): "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy" and that "[s]ince modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy. In the instant case the complaint itself, as well as the fact known to the insurer, sufficiently apprised the insurer of these possibilities; hence we need not set out when and upon what other occasions the duty of the insurer to ascertain such possibilities otherwise arises." (Pp. 276-277.)

 The instant action did present the potentiality of a judgment against the insured and the duty to defend became manifest at the outset.

It is hereby ordered that the judgment of the trial court be modified by allowing defendant a credit in the sum of $1,500, the amount received by

plaintiff from defendant's insured Liles. In all other respects the judgment appealed from is affirmed. Plaintiff is to recover costs on appeal.

Pierce, P. J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.