[No. B204860. Second Dist., Div. Eight. Dec. 30, 2009.]

TAYARIE TRAYSHAUN BAKER et al., Plaintiffs and Respondents, v. NATIONAL INTERSTATE INSURANCE COMPANY et al., Defendants and Appellants.

1320

## COUNSEL

Horvitz & Levy, Julie L. Woods, Peter Abrahams; Sedgwick, Detert, Moran & Arnold and Julia Molander for Defendants and Appellants.

Gordon & Rees, David C. Capell, Sara M. Thorpe and Leslie K. Crary for Association of California Insurance Companies as Amicus Curiae on behalf of Defendants and Appellants.

The Arkin Law Firm, Sharon J. Arkin; Mardirossian & Associates and Garo Mardirossian for Plaintiffs and Respondents.

Jill P. McDonell for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**BIGELOW, J.**—More than 40 years ago, our state Supreme Court was called upon in *Insurance Co. of North America v. Electronic Purification Co.* (1967) 67 Cal.2d 679 [63 Cal.Rptr. 382, 433 P.2d 174] (*Electronic Purification*) to interpret a commercial general liability insurance (CGL) policy with a "products hazard" exclusion for bodily injury damages which included both "products" and "completed operations" language. Reading the language and formatting of the policy which had been placed before it in *Electronic Purification*, the Supreme Court ruled that the "products" and "completed operations" language in the policy exclusion were related, compelling the interpretation that the exclusion applied only to completed operations involving a product, and not to an insured's business activities that involved only services. In short, the Supreme Court concluded that the policy did not exclude coverage for a claim arising from the insured's rendition of a service which was only "remotely related to a product." (*Id.* at p. 691.)

In the case before us today, we are called upon to interpret a CGL insurance policy which also includes an exclusion of coverage for bodily injury damages caused by the insured's "products" and "completed operations." The exclusion we examine has now become standard in the insurance industry nationwide and contains different language and formatting than in *Electronic Purification*. The exclusion advised the insured that it did not have coverage for bodily injury arising "out of 'your product' or 'your work' " and provided separate definitions of "your product" and "your work." (Italics added.) Reading the language in the policy which is at issue in the current case, we find *Electronic Purification*'s interpretation of different language helpful, but not entirely dispositive. Based upon the policy language at issue

in this case, we interpret the insurance industry's standardized "products-completed operations hazard" exclusion language in the same manner as it has been interpreted by other jurisdictions—i.e., to set forth two unambiguous, separate and unrelated circumstances under which coverage is excluded.

The fundamental issue of interest to the parties in the current case is whether the policy excluded coverage for damages resulting from the insured's negligent inspection of a bus, a number of months after the insured had sold the bus. In the context of a motion for summary judgment, the insurer argued that the policy did not provide coverage because the exclusion applied. The trial court followed *Electronic Purification* and denied the insurer's motion for summary judgment, interpreting the policy exclusion to apply only to damages caused by the insured's products and completed operations on its products, namely, the bus. It found that the exclusion did not apply to damages caused by the insured's negligent inspection services, in the event those services were found to be independent of the sale of the bus. Following the summary judgment ruling, a jury found that the insured's sale of the bus had been independent of its later inspection of the bus, and the trial court thereafter entered a judgment awarding damages to the insured for breach of the insurance policy.

We interpret the policy in this case to have excluded coverage to the insured for damages arising from its inspection services, which were a work-related, "completed operation," regardless of whether those inspection services were related to a product, here, the bus. For this reason, the judgment must be reversed and remanded.

## FACTS

*The Policy*

Four Winds Day Camp, Inc. (Four Winds), operated a school bus business whose primary activities involved the transportation of school children. In connection with those transportation activities, Four Winds also performed inspection and mechanical services on school bus vehicles. In November 2000, American National Fire Insurance Company (American)[1] issued a one-year CGL insurance policy to Four Winds. Four Winds paid a premium of $2,100 for the liability coverage provided under the policy.

The policy's declarations page indicated it covered damages resulting from bodily injury or property damage caused by an accident, where the insurance

---

[1] Our references to American include National Interstate Insurance Company and Great American Insurance Company of New York.

applied. It set forth an aggregate, personal and advertising injury and each occurrence limit for claims "Other than Products—Completed Operations" at $1 million. It indicated that a "Products—Completed Operations Aggregate Limit" was not applicable. It stated that American had the right and duty to defend Four Winds in lawsuits seeking damages covered by the policy.

The policy included an endorsement page which advised that it modified the policy. The endorsement page said the insurance did not apply to bodily injury or property damage included within the "Products-completed operations hazard" as defined in the policy.

The body of the insurance policy included a part devoted to definitions, three of which are relevant to this case. The first defined "Products-completed operations hazard" as bodily injury and property damage that occurred away from the insured's premises and that arose out of " 'your product' or 'your work.' " The other two definitions were embodied in distinct paragraphs, and separately defined "your product" and "your work." Products were explained to be goods or products that were "manufactured, sold, handled, distributed or disposed of" by the insured. The definition of work included "work or operations performed by you . . . ."

*The Accident*

The operator of a school bus is required by law to inspect its bus every 45 days or 3,000 miles, whichever comes first. In addition to these operator-connected inspections, the California Highway Patrol must inspect the bus both on a yearly basis and after any change in ownership. After the highway patrol passes a bus at an annual inspection, or a change of ownership inspection, the agency issues an inspection approval certificate which the operator must place inside the bus in a visible certificate holder. Following the sale of a bus, the highway patrol requires the purchaser to have a 45-day/3,000 mile inspection performed before the agency conducts its separate change of ownership inspection.

In July 2000, Four Winds sold one of its used buses to La Shaun Clemmons, an owner and operator of another bus business, Precise Transportation. Later, sometime around September 2000, Four Winds agreed to perform—for payment—the 45-day/3,000 mile inspection which was required prior to the highway patrol's change of ownership inspection. During September and October 2000, Four Winds performed the 45-day/3,000 mile inspection, including related maintenance work, on the bus which it had sold to Clemmons. Four Winds made repairs to seat covers and bolts on some of the passenger seats in the bus and made welding repairs on one of the seats. Shortly thereafter, Four Winds replaced two windows and did additional work

on the bus's alternator and connectors. Meanwhile, the highway patrol performed its change of ownership inspection on the bus purchased by Clemmons. On November 1, 2000, the highway patrol issued a new inspection approval certificate with Clemmons's company, Precise Transportation, identified as the owner of the bus.

On April 9, 2001, Clemmons was driving the bus on a local freeway when she was involved in a collision with a pickup truck. Clemmons suffered fatal injuries when the driver's seat of the bus broke loose from the floor, and she was ejected through the front windshield of the vehicle.

*The Underlying Wrongful Death Lawsuit and Coverage Dispute*

Clemmons's surviving husband, Antonio Baker, Sr., and her sons, Tayarie Trayshaun Baker and Antonio Baker, Jr., by their guardian ad litem (collectively the Bakers), filed a wrongful death action against Four Winds and several other defendants. Broadly summarized, the Bakers' wrongful death complaint was founded on allegations that the occupant restraint system in the bus she had been driving had failed, causing Clemmons's driver's seat to dislodge from the bus, and to be ejected onto the freeway, into oncoming traffic, resulting in Clemmons's death. The Bakers' first cause of action based on negligence alleged that Four Winds "negligently and carelessly repaired, serviced and maintained the bus by replacing the bolts securing the driver's seat with bolts of inadequate size, strength and/or number . . . ." A second cause of action based on strict liability alleged that the bus was defective and unsafe for its intended purpose because the driver's seat was installed with bolts or screws that were inadequate in size, strength and number. A fourth cause of action based on breach of implied warranty alleged that Four Winds, as the seller of the bus, had impliedly warranted that the bus was fit for the ordinary purposes for which it was intended, and that the driver's seat was secured in a manner to prevent Clemmons from being ejected in the event of an accident.

Four Winds tendered its defense of the Bakers' wrongful death action to American, but American denied a defense based on the ground that Four Winds "did not have products or completed operations coverage" under its policy as a result of the exclusion of coverage for damages arising within the definition of the "Products-completed operations hazard." Later, as the Bakers' underlying wrongful death action was approaching trial, Four Winds submitted a $1 million policy limit demand to American to settle the Bakers' case. American denied Four Winds's demand to settle the Bakers' lawsuit.

The Bakers' wrongful death lawsuit was tried to the trial court, sitting without a jury. During the trial, the Bakers dismissed their causes of action

for strict liability and breach of implied warranty, leaving only their negligence cause of action against Four Winds. The trial court in the Bakers' wrongful death action entered a judgment with findings that Four Winds negligently inspected or negligently maintained the bus sold to Clemmons, and that Four Winds's negligence was a *substantial factor in causing Clemmons's death.* The judgment also included a finding that the Bakers' damages totaled $13,776,201. In accord with a pretrial "high-low agreement" between the Bakers and Four Winds, the trial court entered a final judgment in favor of the Bakers, and against Four Winds, in the amount of $9 million, plus costs and interest.

## The Current Breach of Insurance Contract Lawsuit

Subsequently, the Bakers entered into a covenant not to execute on the final judgment against Four Winds. In exchange, the Bakers accepted an assignment of the company's rights against American under the CGL policy issued to Four Winds.

The Bakers, as the assignee of Four Winds's rights under its policy with American, filed the current action against the insurer, alleging causes of action for breach of insurance contract and breach of the implied covenant of good faith and fair dealing. Both causes of action were based on American's failure to defend Four Winds against the Bakers' underlying wrongful death lawsuit, and on its failure to settle that lawsuit for the $1 million policy limits of Four Winds's policy. In addition to the claims as assignee of Four Winds's contract rights, the Bakers also alleged a direct cause of action against American pursuant to Insurance Code section 11580, subdivision (b)(2).

American moved for summary judgment, arguing that the policy did not provide coverage for the Bakers' underlying wrongful death lawsuit because of the "products-completed operations" exclusion included in the policy. The trial court entered a written order denying American's motion for summary judgment. It ruled that the exclusion in American's policy only applied to product liability related claims, not to claims for negligent maintenance or inspection services, and that triable issues of fact existed regarding whether Four Winds's inspection and maintenance services on the bus sold to Clemmons were independent of the sale of the bus.

During pretrial conferences, the Bakers agreed to limit their recovery to the amount of the final judgment in their underlying wrongful death action and waive any claim for bad faith damages. The trial court empanelled a jury to decide a single special verdict question: Whether the inspection or maintenance provided by Four Winds was independent of the sale of the bus. The jury answered "yes" to the special verdict. The trial court then issued a

statement of decision in which it ruled that the "products-completed opera-
tions" exclusion in American's policy had not been applicable to the Bakers'
underlying wrongful death action, that American had breached its insurance
contract with Four Winds, and that the Bakers therefore were entitled to a
judgment for the full amount of the $9 million judgment entered in their
underlying wrongful death action.

The trial court entered a final judgment against American and in favor of
the Bakers in the amount of $11,958,326.90, reflecting the $9 million
judgment in their underlying wrongful death action, plus costs and interest.
The court thereafter denied American's motions for a new trial, for judgment
notwithstanding the verdict, and to vacate the judgment pursuant to Code of
Civil Procedure section 663.

American filed a timely appeal.

## DISCUSSION

I. *The Policy Excluded Coverage for the Underlying Wrongful Death
 Action*

American contends the judgment must be reversed because the policy it
issued to Four Winds did not provide coverage for the Bakers' underlying
wrongful death claims. Coverage did not exist, says American, because the
policy exclusion for damages within the definition of the "Products-
completed operations hazard" applied to the Bakers' claims. In other words,
American contends the trial court wrongly interpreted the policy to provide
coverage to Four Winds for the Bakers' claims where coverage for such a
claim had been excluded. We agree.

### A. *The Rules Governing the Interpretation of an Insurance Contract*

A court's first task in interpreting an insurance policy involved in a
coverage dispute is to determine whether the language of the policy, as it
would be construed by a layperson, is ambiguous. (See, e.g., *AIU Ins. Co. v.
Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]
(*AIU Ins.*).) If the language of the policy is not ambiguous, then the coverage
inquiry ends, and the court determines coverage by applying the plain
meaning of the unambiguous provisions of the policy. (*Ibid.*) A policy's
language is ambiguous when it is susceptible to two or more reasonable
interpretations. (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity
Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) A court
may not adopt a strained or absurd interpretation in order to find ambiguity
where none would otherwise exist in the language itself. (*Ibid.*)

Where a court concludes that policy language is ambiguous, it takes a second step in the interpretation analysis, determining whether a finding of coverage under the policy is consistent with the objectively reasonable expectations of the insured. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) In determining whether coverage is consistent with the insured's objectively reasonable expectations, the disputed policy language must be examined in the context of the intended function in the policy. (*Nissel v. Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1111–1112.) This examination requires a court to consider the policy as a whole, and the circumstances of the underlying case in which the claim arises, taken together with a dose of common sense. (*Id.* at p. 1112.)

■ Where ambiguity still remains after application of the reasonable expectation test, a court takes a final step in the interpretation analysis, construing the ambiguous language against the insurer, and in favor of coverage. (See *Bank of the West, supra,* 2 Cal.4th at p. 1265.) This final step, however, does not provide a path to an absolute contractual entitlement to coverage, and a court may not rewrite a policy to bind an insurer to cover a risk which it did not contemplate covering, and for which it was not paid to provide coverage. (*Levy v. State Farm Mutual Automobile Ins. Co.* (2007) 150 Cal.App.4th 1, 7 [58 Cal.Rptr.3d 54].)

### B. *The Interpretation Issue Involved in This Case*

Accepting the jury's factual foundation that Four Winds's sale of the bus to Clemmons stood independent of its later inspection of the bus, this case presents this primary issue: Did the "Products-completed operations hazard" exclusion contained in the policy which American issued to Four Winds apply to the Bakers' underlying claims for damages arising from Four Winds's negligent inspection of the bus sold to Clemmons? Neither party has cited any California case interpreting the language of the policy exclusion which is involved in this case. Our independent research did not reveal such a case either.[2] However, both parties' briefs have directed us to *Electronic Purification, supra,* 67 Cal.2d 679, as a starting point, and that is where we begin our consideration of this case.

---

[2] Amicus curiae Association of California Insurance Companies has advised us that the policy language contained in American's policy has been examined for ambiguity in published opinions rendered by courts in other jurisdictions, but not in any published case issuing out of a California court. We discuss those opinions *post.*

## C. *The Policy in Electronic Purification*

In *Electronic Purification, supra,* 67 Cal.2d 679, a company that sold, leased, and installed water purification machines purchased a "Comprehensive Liability Insurance" policy, which began with an agreement by the insurer to provide general coverage against all bodily injury claims. (*Id.* at p. 683, italics omitted.) Under subheadings entitled "Exclusions" and "Conditions," the policy then set forth situations in which this general coverage did not apply.

The listed exclusions and conditions included an exclusion for "Products hazard," which the policy defined as follows:

" 'The term "products hazard" means

" '(1) goods or products manufactured, sold, handled or distributed by the named *insured* . . . , if the occurrence or accident takes place after possession of such goods or products has been relinquished to others by the named *insured* . . . and if such occurrence or accident takes place away from premises owned, rented or controlled by the named *insured,* . . . but [such goods] shall not include any vending machine or any property, . . . *rented* to or located for use of others but not sold;

" '(2) *operations,* if the occurrence or accident takes place *after such operations have been completed* or abandoned and takes place away from premises owned, rented or controlled by the named *insured;* provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (a) pickup or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the *insured,* (c) the existence of tools, uninstalled equipment and abandoned or unused materials.' " (*Electronic Purification, supra,* 67 Cal.2d at p. 683, fn. 3, original italics.)

## D. *The Analysis in* Electronic Purification

The underlying accident in *Electronic Purification* unfolded in the following series of events: The insured company leased one of its water purification machines, a "Nion generator," to the owners of a motel for use in the motel's swimming pool. Before the insured company installed the Nion generator, it suggested to the motel owners that they hire the employees who were going to install the generator to acid-wash black algae from the walls of the pool. The motel owners agreed. Cleaning the algae was not required for the

operation of the Nion generator. While the employees were acid-washing the walls of the swimming pool, a submerged pool floodlight "blew out," and the employees replaced it. Due to negligence in repairing the floodlight fixture, its frame became charged with electricity, and a 12-year-old motel guest who swam in the pool was fatally electrocuted when he came into contact with the floodlight fixture. The youth's parents thereafter filed a wrongful death lawsuit against the company which supplied the water purification generator, as well as the employees who installed the machine, who had also acid-washed the swimming pool and improperly replaced the floodlight fixture. When the insured company tendered the wrongful death lawsuit to its insurer, the insurer denied coverage, citing the policy's "products hazard" exclusion. In the context of a declaratory relief action addressing the issue of coverage, the Supreme Court ruled that the "products hazard" exclusion was inapplicable to the underlying wrongful death lawsuit. (*Electronic Purification, supra*, 67 Cal.2d at pp. 681–687.)

In the first part of the Supreme Court's opinion in *Electronic Purification*, the court noted that the products hazard exclusion did not apply to rented products. Since the Nion generator was leased and not sold, the exemption did not exclude coverage for the underlying wrongful death claims insofar as they were based on electrocution by the leased Nion generator. The insurer attempted to take the exclusion of rented products one step further—it argued that rented products were entirely excluded from policy coverage by the products hazard provision. (*Electronic Purification, supra*, 67 Cal.2d at pp. 685–686.) The Supreme Court disagreed, and determined that "since rented products are excepted from the products hazard exclusion they come within the [policy's] general coverage." (*Id.* at p. 686.) There is no rented product or language involved in this case, and we have touched on the Supreme Court's "rented" products discussion in *Electronic Purification* briefly here, only to put the remaining portion of the case in context.

The Supreme Court next addressed whether the "products hazard" exclusion applied to the underlying wrongful death lawsuit insofar as its "completed operations" language was concerned. An alternative theory of liability in the complaint alleged the death resulted from the negligence of the employees in repairing the underwater floodlight, an "operation." The court held that even though the exclusion contained separate paragraphs for "goods or products" and "operations," they must be read together, as both applying to nonrented products. The only operations included within the exclusion then, are those which are closely related to a product the insured sold, and not purely service operations. (*Electronic Purification, supra*, 67 Cal.2d at p. 686.) The Supreme Court explained:

"The language of the policy compels such a reading. The exclusion bears the heading in bold face: 'Products Hazard,' and begins, 'The term *"products*

hazard" means . . . .' (Italics added.) That introductory clause must refer to both the 'goods and products' subdivision as well as the 'operations' subdivision. Both are indented under that same heading and separated by only a semicolon. The 'operations' subdivision starts with an uncapitalized letter, and unless the introductory clause applies to it as well as to the first subdivision, it is stranded as an incomplete sentence without subject or verb.

"Unless the subdivisions both relate to products, no reason justifies their joinder under a single heading. Moreover, coverage under one subdivision cannot be purchased independently of the other." (*Electronic Purification, supra,* 67 Cal.2d at p. 687.)

The court concluded that because "the definition of product does not include rented property and since the only property with which the operations could arguably be connected is the leased Nion generator, the exclusion of products hazard does not apply to the instant fatality." (*Electronic Purification, supra,* 67 Cal.2d at pp. 687–688.)

In a third part of its *Electronic Purification* opinion, the Supreme Court addressed the question whether the "completed operations" language included in the "products hazard" exclusion, examined alone, would apply to exclude coverage for performing negligent services under the subject policy. It is this part of the *Electronic Purification* opinion which is most relevant to the case and policy before us in today's case. In it, the Supreme Court focused on the policy language defining the difference between "completed" versus "uncompleted" operations, as well as the question of whether the "operations" language related to products. (*Electronic Purification, supra,* 67 Cal.2d at p. 688.)

The court began this part of its discussion by noting that the insured also could be liable under the independent theory that negligence in replacing the floodlight caused the boy to be electrocuted, thus creating liability from improperly performing the acid-washing, which was a service. That service would be covered by the policy, the California Supreme Court concluded, because acid-washing of the pool was not related to installation of the Nion generator and thus was not a "completed operation" related to a nonrented product—the only type of service encompassed within the exclusion. (*Electronic Purification, supra,* 67 Cal.2d at pp. 688–689.)

The court explained that the "products hazard exclusion" was created to prevent insurers from being held strictly liable for inherently dangerous products. But the exclusion draws an arbitrary demarcation for cessation of insurance liability when operations are "completed" without defining what is meant by the term "operation." As a result, courts cast a skeptical eye at

drawing the end line for coverage at completed operations and are wary not to give the exclusion so broad a definition that "it cuts away the very insurance which the ordinary businessman would expect under the policy. These courts have looked at all the relevant circumstances, including the disclosed nature of the business of the insured, to determine the nature of the exclusion. In so doing they follow the general principle that they should not interpret the provision 'to remove from the coverage of the policy a risk against which the circumstances under which and the purposes for which the policy was written indicate the insured intended to protect himself . . . .' [Citation.]" (*Electronic Purification, supra*, 67 Cal.2d at pp. 688–689.)

Applying that reasoning to the policy at issue in *Electronic Purification*, the court stated that too broad an interpretation of the products hazard exclusion would "eliminate practically all meaningful insurance for Electronic." (*Electronic Purification, supra*, 67 Cal.2d at p. 690.) Because almost all of the business Electronic did could be considered connected in some way with the Nion generator, if a broad interpretation were given to the products hazard exclusion, then only losses occurring before it completed an operation would be covered. That, the court held, would undermine its principal objective in buying insurance. (*Ibid.*)

The court determined that acid-washing was not closely connected to the operation of installing a Nion generator. It distinguished operations that could be considered sufficiently connected: "for example, installation of the Nion generator at the site or adjustments to it that might be necessary in order that it function properly." (*Electronic Purification, supra*, 67 Cal.2d at p. 690.) Acid-washing, the Supreme Court held, is not that type of work.

"It relates to the Nion generator only in that the common purpose of both is the maintenance of a clean, healthy swimming pool. The Nion generator could function as well with or without the algae. The acid-washing is a service independent of the Nion generator that Electronic makes available to its customers because of their mutual interest in achieving optimum sanitary conditions in the pool. . . .

"The cases regularly hold that since the completed operations provision must be read to apply only to operations involving a *product*, it does not apply to an insured's business if it involves services only, or if the product composes but a minimal part of the business. Similarly, if the business of the insured may be severed into operations not related to a product, only those operations that do involve a product are subject to the completed operations exclusion. In the present case, the installation of the Nion generator and the acid-washing are severable operations for the reasons discussed; they are not mutually dependent: either can be performed without the other and they need

not be performed at the same time nor by the same person." (*Electronic Purification, supra,* 67 Cal.2d at pp. 690–691, fns. omitted.)

### E. The Policy Interpreted

#### 1. The Policy in This Case

The policy in the current case is different from the one at issue in *Electronic Purification.* To show the distinction in the policy language, we set forth the relevant portion of Four Winds's policy verbatim.

The policy's declarations page included the following information setting forth the

"LIMITS OF INSURANCE:"

| | |
|---|---|
| "General Aggregate Limit (Other than Products-Completed Operations) | $1,000,000 |
| "Products-Completed Operations Aggregate Limit | N/A |
| "Personal and Advertising Injury Limit | $1,000,000 |
| "Each Occurrence Limit | $1,000,000" |

The policy's insuring clauses provided:

"a. [American] will pay those sums that [Four Winds] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. [American] will have the right and duty to defend [Four Winds] against any 'suit' seeking those damages. [American] will have no duty to defend [Four Winds] against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. . . . [¶] . . . [¶]

"b. This insurance applies to 'bodily injury' and 'property damage' . . . [¶] . . . caused by an 'occurrence' . . . ."[3]

### The Policy Exclusion

The policy issued by American included a separate, attached endorsement page which expressly advised Four Winds that the endorsement "change[d] the policy." The endorsement page included this title in boldfaced lettering:

"EXCLUSION-PRODUCTS-COMPLETED OPERATIONS HAZARD"

---

[3] The policy defined an "occurrence" to mean "an accident . . . ."

The endorsement page itself contained this language: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard'."

*The Policy Definitions*

The body of the insurance policy included a section devoted to "DEFINITIONS." Three definitions set forth in the policy are relevant to this case:

"16. 'Products-completed operations hazard':

"a. Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:

"(1) Products that are still in your physical possession; or

"(2) Work that has not yet been completed or abandoned. However 'your work' will be deemed completed at the earliest of the following times:

"(a) When all of the work called for in your contract has been completed.

"(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

"(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

"Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

"20. 'Your Product' means:

"a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

"(1) You;

"(2) Others trading under your name; or

"(3) A person or organization whose business or assets you have acquired; and

"b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

" 'Your product' includes:

"a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'; and

"b. The providing of or failure to provide warnings or instructions. . . .

"21. 'Your work' means:

"a. Work or operations performed by you or on your behalf; and

"b. Materials, parts or equipment furnished in connection with such work or operations.

" 'Your work' includes:

"a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and

"b. The providing of or failure to provide warnings or instructions."

###### 2. *The Policy's "Product" and "Completed Operations" Language Are Not Related*

Because the standardized policy language and formatting involved in the case before us today were not present in the policy considered in *Electronic Purification*, we write on a clean slate. We begin with an easy conclusion: the exclusion contained in the policy which American issued to Four Winds excluded coverage for bodily injury claims arising from accidents involving Four Winds's "products-completed operations," as defined in the policy. The language of the exclusion in its overall presentation is not ambiguous: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard.' " The exclusion at issue in the current case, in its broadest presentation, and as it would be read and understood by a layperson, is not mysterious. When a claim for damages arose from an accident within the meaning of the definition of the "Products-completed operations hazard" in the policy, the claim was excluded from the policy's coverage.

Taking the next step in the interpretation analysis, the step at the heart of this case, we find the exclusion for claims arising within the meaning of the

"Products-completed operations hazard" is equally unambiguous, and that it plainly applied to the Bakers' underlying wrongful death lawsuit. Unlike the "products hazard" exclusion which was at issue in *Electronic Purification*, which we agree was unclear, the exclusion in the policy which American issued to Four Winds, excluding coverage for claims arising within the definition of the "products-completed operations" hazard is unambiguous and easily understandable by a layperson policy reader.

American's policy defined the "Products-completed operations hazard" to include "all 'bodily injury' and 'property damage' . . . *arising out of 'your product' or 'your work'* . . . ." (Italics added.) The use of the disjunctive conjunction "or" within the definition of the "Products-completed operations hazard" unambiguously advised Four Winds that a claim alleging bodily injury arising either from Four Winds's "product," *or* from Four Winds's "work," was excluded from the policy's coverage. By employing the disjunctive conjunction "or" between the words "your product" and "your work," the policy advised and warned Four Winds that the "hazard" which was excluded from the policy's coverage was the hazard arising from either its "products," once they were out of Four Winds's possession, or from its "work," once that work was completed and put to use away from its premises. We simply see no other reasonable reading that can be given to the policy language.

The Bakers posit the existence of ambiguity by arguing that the definition of the "Products-completed operations hazard" set forth in American's policy may reasonably be interpreted to mean " 'bodily injury' and 'property damage' . . . arising out of 'your product' or 'your work *on your products*' . . . ." We would agree with the Bakers, *if* the policy did not otherwise provide express definitions for the subordinate, included terms "your product" and "your work." The policy, however, does define the meaning of these terms. Unlike the compression of the terms "products" and "operations" into a single definition, as was the situation in the policy language which was at issue in *Electronic Purification*, the policy which American issued to Four Winds contained separate definitions of "your product" and "your work," clarifying the separate nature of the insured's "products" and its "work." The policy's definition of "your work" is not amenable to a construction that the term means "your work on your products." On the contrary, the policy defines the term "your work" in paragraph 21 to mean "[w]ork or operations performed by you or on your behalf; and [¶] . . . [m]aterials, parts or equipment furnished in connection with such work or operations." We see nothing in this definition to suggest that "work" is limited to "work on products."

In summary, the policy that American issued to Four Winds cannot reasonably be interpreted, unlike the situation in *Electronic Purification*, to

mean that "operations" and "products" are "related" terms. The language in the policy before us today compels an interpretation that a claim arising from Four Winds's "work," and occurring in the course of an accident off its premises, was not covered, without regard to whether that work was or was not "related" to a "product." Simply put, the difference in the policy language dictates this outcome. (*Cf. Mitsui Manufacturers Bank v. Texas Commerce Bank-Fort Worth* (1984) 159 Cal.App.3d 1051, 1057 [206 Cal.Rptr. 218] ["Here, as in any contract . . . , different language would have yielded a different result."].)

Our interpretation of the exclusion's language is in accord with several different courts which have analyzed the same or similar standardized policy language. (See, e.g., *Goodwin v. Wright* (2000) 100 Wn.App. 631 [6 P.3d 1] (*Goodwin*); *Flint v. Universal Mach. Co.* (1996) 238 Conn. 637 [679 A.2d 929] (*Flint*); *Boyer Metal Fab v. Maryland Casualty Co.* (1988) 90 Ore.App. 103 [750 P.2d 1195].)

In *Goodwin*, a worker was injured as a result of a malfunctioning rebuilt hydraulic cylinder in a truck he was operating. The insured, Eastside Machine, made the cylinder "by disassembling two others and making one." (*Goodwin, supra,* 6 P.3d at p. 3.) At the time of the accident, Eastside was insured under a CGL policy which excluded coverage for claims arising under the "products-completed operations hazard" defined in the policy. With the exception of a few insignificant words, the exclusion is a verbatim copy of the one at issue in this case. The court found that the language of the standardized exclusion was not ambiguous: "The modern CGL policy provides basic 'premises and operations' coverage. This coverage insures for damages arising out of an occurrence at the insured's place of business as a result of the insured's ongoing business activities. The risk covered by the CGL premises and operations coverage differs from the risk posed once an insured relinquishes its products to third parties or completes its work. This latter risk is insured, for an additional hefty premium, under the products-completed operations hazard coverage. The purpose of the products-completed operations hazard coverage is to insure against the risk that the product or work, if defective, may cause bodily injury or damage to property of others after it leaves the insured's hands." (*Goodwin, supra,* 6 P.3d at p. 4, fns. omitted.) The court concluded that the products-completed operations exclusion of the CGL policy barred coverage for Goodwin's personal injury damages. Whether Eastside's cylinder was considered a product or the repair work a service—in either event—the exclusion barred coverage.

Similarly, in *Flint*, the Virginia Supreme Court ruled that a modern, standardized "products-completed operations hazard" exclusion—again, a nearly verbatim copy of the one at issue here—was unambiguous and barred

coverage for an insured company's negligent repair of a machine press. The court noted that exclusion's title could be more artfully drafted but that "the exclusion as contained in the policy clears up whatever confusion might be embodied in its title. The definition expressly states that all bodily injury or property damage 'arising out of "your product" or "your work" ' is excluded from coverage . . . 'the use of the disjunctive conjunction "or" unambiguously requires that either of the exclusions separated by the conjunction, if applicable, excludes coverage.' By use of the conjunction 'or' between product and work, it is made sufficiently clear that the 'hazard' to be excluded is that arising from *either* products once out of the insured's possession, *or* from the insured's work once completed. There is no other reasonable reading that may be given to this language." (*Flint, supra,* 679 A.2d at pp. 933–934.)

We reject the opposite conclusion reached in *Prosser Com'n Co. v. Guaranty Nat. Ins. Co.* (1985) 41 Wn.App. 425 [700 P.2d 1188]. The *Prosser* court's conclusion that the standard products-completed operations hazard exclusion relates products to completed operations is reached without any meaningful analysis of the exclusion's language, and, instead, is based on little more than a citation to *Electronic Purification.* For the reasons noted above, we do not find *Electronic Purification* to provide the interpretation of the modern products-completed operations hazard exclusion.

■ Although we tend to agree with the *Flint* court's observation that the insurance industry could draft a more commonplace, standardized title for a "products-completed operations hazard" exclusion, the test is not whether a policy could be written better, from a customer service perspective, after the fact, but instead whether, as written, it is ambiguous in the first instance. Given the record in this case, American's policy is not. Thus, while we have some curiosity about why an insurance policy cannot include separate exclusions for an insured's "products" and for the insured's "work," and why the insurance industry continues to combine "products" and "work" in a single exclusion, and why the insurance industry does not entitle a policy which is effectively a "premises liability" policy as a "premises liability" policy, we need not satisfy our curiosity. As we have said, the interpretation test is not better after the fact, but ambiguity in the first instance. For the reasons we have stated, we find no ambiguity in American's policy.

We disagree with the suggestion submitted by amicus curiae Consumer Attorneys of California that we would be undoing decades of insurance policy jurisprudence by deciding today's case differently than *Electronic Purification.* Any difference between the outcome of *Electronic Purification* and the outcome of the case before us today is a reflection of the differences in language used in the two different policies at issue in each case. We have

not decreed as a matter of law that "products" and "completed operations" shall no longer be considered "related" elements under a CGL policy; that determination is governed by language used in a particular insurance policy.[4]

### 3. *Four Winds's "Inspection" Services Constituted Its "Work"*

The remaining question, therefore, is whether Four Winds's "inspection" services on the bus that it sold to Clemmons fit within the definition of "your work" in the policy which the company purchased from American. As we explain, "inspection services" are "work."

The policy which American issued to Four Winds included this definition: " 'Your work' means: [¶] a. *Work or operations performed by you* . . . ; and [¶] b. Materials, parts or equipment furnished in connection with such work or operations. [¶] 'Your work' includes: [¶] a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and [¶] b. The providing of or failure to provide warnings or instructions." (Italics added.)

■ We simply do not understand how Four Winds's inspection of a bus, in return for payment, could not fall within the meaning of the words "work or operations performed" by Four Winds. When a person provides a service for a customer, for payment from that customer, the person is "working" or otherwise "performing an operation" in the context of his or her business activities, and we reject the Bakers' syllogism that, "[b]ecause the exclusion must be narrowly construed [citation], and because the definition of 'your work' does not include [the word] 'inspections,' the underlying claim is not included within the exclusion for 'your work.' "

Turning back to *Goodwin* and *Flint* we find further validation for this point. In *Goodwin*, the plaintiff argued the insured, Eastside Machine, which made the cylinder "by disassembling two others and making one," was doing work. (*Goodwin, supra*, 6 P.3d at pp. 3, 6–7.) Similarly in *Flint*, it was taken for granted that the negligent repair of a machine press fell within the purview of "work" within the meaning of the products-completed operations hazard exclusion. (*Flint, supra*, 679 A.2d 929.)

---

[4] We note that Four Winds paid an annual premium of $2,100 for its policy. In *Goodwin, supra*, 6 P.3d 1, which was decided almost 10 years ago, the annual premium for a CGL policy with a products-completed operations hazard exclusion similar to the one in Four Winds's policy was $1,215, while coverage for such a hazard was "available separately for an estimated $12,000 annually." (*Id.* at p. 3.) Although we need not determine Four Winds's "reasonable expectations" inasmuch as we have found its policy unambiguous, we question whether any "average" business enterprise could reasonably expect that, for $2,100, it could purchase $1 million in insurance covering damages claims arising from its work on school buses.

 Those cases aside, the standard rules used to interpret insurance contracts support the position that the inspection was work. Where a term used in an insurance policy is not defined, it must be interpreted in its " 'ordinary and popular sense.' " (*AIU Ins., supra,* 51 Cal.3d at p. 822.) Although exclusions are generally viewed through a more critical prism, the principle that words are considered in their "ordinary and popular sense" is not discarded, and, thus, in interpreting a word in an insurance policy, including a word in an exclusion, a court may consult and consider definitions found in a common dictionary, provided the court does not disregard the policy's context, and maintains an eye on the fundamental goal of deciding how a layperson policyholder might reasonably interpret the exclusion's language. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) We are satisfied that a proverbial layperson would understand the term "work" to mean something along the lines of "the labor . . . that is one's . . . means of livelihood" (Merriam-Webster's Collegiate Dict. (10th ed. 1999) at p. 1336), and would accept that a business's "inspection services" were a type of "work," particularly where the business charged a fee for the inspection.

We are not persuaded to render a different interpretation based on the Bakers' argument that the word "work" as used in the subject policy does not encompass the acts which Four Winds performed on Clemmons's bus because the policy did not specifically include the word "inspections" within the definition of "work." To avoid ambiguity under the strict rule proffered by the Bakers, "an insurer would have to define every word in its policy, the defining words would . . . have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866–868 [21 Cal.Rptr.2d 691, 855 P.2d 1263] [declining to find the word "related" ambiguous because it was not defined].) As the Supreme Court has succinctly stated: "[R]eliance on common understanding of language is bedrock." (*Id.* at p. 867.) We are confident that the common understanding of "work" includes a person's services performed in return for payment of money. Given the ordinary and popular meaning of the term "work," the scope of the "completed operations" element of the products-completed operations hazard exclusion attached to Four Winds's policy is not ambiguous. The policy excluded coverage for injuries arising from Four Winds's work, namely, its (negligent) inspection of the bus.

II. *The Special Verdict Issue Is Moot*

Having determined that summary judgment should have been entered in favor of American, we do not reach the insurer's contention that the language

of the trial court's special verdict form may have misled the jury into finding a "disconnect" between its sale of the bus, and its subsequent inspection of the bus. Whether connected or disconnected to any product, and whether independent or dependent of any sale of any product, the policy that American issued to Four Winds did not cover lawsuits for damages arising from an accident caused by the company's inspection "work" on the bus Clemmons was driving at the time she was killed.

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to vacate its order denying American's motion for summary judgment, and to enter a new and different order granting the motion, and thereafter to enter summary judgment in favor of American. The parties are to bear their own costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.