# Illinois Official Reports

## Appellate Court

*City of Park Ridge v. Clarendon American Insurance Co.*, **2017 IL App (1st) 170453**

| | |
|---|---|
| Appellate Court Caption | THE CITY OF PARK RIDGE, a Municipal Corporation, and HIGH-LEVEL EXCESS LIABILITY POOL, Plaintiffs-Appellants, v. CLARENDON AMERICAN INSURANCE COMPANY; A.G., a Minor, by Her Parents and Next Friends, MARZENA SASSAK and GREGORY GORMAN, Defendants (Clarendon American Insurance Company, Defendant-Appellee). |
| District & No. | First District, Third Division<br>Docket No. 1-17-0453 |
| Filed<br>Rehearing denied | October 18, 2017<br>November 20, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-00806; the Hon. Sophia H. Hall, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael Resis and Ellen L. Green, of SmithAmundsen LLC, of Chicago, for appellant City of Park Ridge.<br><br>Thomas DiCianni, of Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer PC, of Chicago, for other appellant.<br><br>Keith Moskowitz and Kathleen Kinsella, of Dentons US LLP, of Chicago, for appellee. |

JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Cobbs and Justice Howse concurred in the judgment and opinion.

# OPINION

¶ 1    This appeal arises from the trial court's order, granting summary judgment to defendant Clarendon American Insurance Company (Clarendon). On appeal, plaintiffs City of Park Ridge (Park Ridge) and its excess carrier, High-Level Excess Liability Pool (HELP), contend that the trial court erroneously granted defendant's motion for summary judgment because the court erred in determining that emergency medical services fell within the scope of the "Products-Completed Operations Hazard" provision under the insurance policy, which affected how much Clarendon would have to pay in two separate claims. We reverse the trial court's order of summary judgment in Clarendon's favor and remand the case for the trial court to enter summary judgment for plaintiffs Park Ridge and HELP.

¶ 2                                    BACKGROUND

¶ 3    This insurance dispute arises out of monies paid to two plaintiffs who sued Park Ridge for two separate occurrences. In the first, defendants Marzena Sassak and Gregory Gorman sued in federal court after a confrontational traffic stop ended in personal injury. After a later, but related, suit was filed on behalf of their minor child, Gorman settled his case for an amount in excess of $600,000, the first $250,000 of which was paid by Park Ridge because it had a self-insured retention in that amount. The remainder was paid by Clarendon.

¶ 4    The second lawsuit involved allegations that Park Ridge paramedics failed to provide any treatment whatsoever to a 15-year-old boy whose father summoned paramedics when he was found to be unresponsive around 1:10 a.m. Some hours later, the paramedics were summoned again, when the boy was unresponsive and blue. He was transported to the hospital where he was diagnosed as brain dead owing to a drug overdose. He later died.

¶ 5    The deceased boy's mother, Jo Ann Abruzzo, filed a survival action and wrongful death action, which was dismissed by the trial court. The dismissal was affirmed by the appellate court, only to be reversed by the Illinois Supreme Court. The court determined that the Emergency Medical Services (EMS) Systems Act (EMS Act) (210 ILCS 50/3.150(a) (West 2004)) applied to plaintiff's allegations rather than sections of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/6-105, 6-106(a) (West 2004)) and remanded the case for further proceedings. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 348 (2008). All of these legal peregrinations are fully explicated in our opinion which affirmed the jury's subsequent verdict of $5,187,500. See *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360. In that opinion, we found that the evidence established a complete lack of any assessment, diagnosis, treatment, or professional judgment by the responding emergency medical technicians or paramedics in the first trip to the family home. Part of that proof involved an admission made by a Park Ridge lawyer in a reply brief in which the city was claiming immunity because their paramedics provided "no treatment" at the first stop.

¶ 6    When confronted with the sizeable judgment affirmed by this court, Park Ridge made efforts to resolve the *Abruzzo* case, but ran into resistance from Clarendon, which sought to apply the monies paid in the Gorman matters to a $2 million aggregate limit in its policy with the city. After some negotiations, Park Ridge and HELP agreed to provide the necessary funds to settle the case, while leaving the matter of Clarendon's potential contribution to be litigated later, with Park Ridge claiming that Clarendon was obligated to pay its $2 million "occurrence" limit and Clarendon claiming that the money paid in the Gorman matter should have been subtracted from its $2 million "aggregate" limit under another section of the policy.

¶ 7                                     The Insurance Litigation

¶ 8    Appellants filed a three-count complaint against Clarendon. Count I sought declaratory relief that Clarendon was obligated to pay a $2 million occurrence limit in *Abruzzo* because the facts of that case took it out of the "aggregate" limit provided for "Personal Injury," "Public Officials' Errors and Omissions," or the "Products-Completed Operations Hazard" as punctiliously detailed in the relevant policy. Count II claimed a breach of contract owing to the refusal to pay the $2 million. Count III sought additional monies from Clarendon owing to its obligation to indemnify and defend Park Ridge in the second Gorman suit, alleging that the aggregate limit was not fully eroded in the previous Gorman lawsuit. Clarendon filed counterclaims, which were answered by Park Ridge and HELP, and ultimately, the disputes culminated with dueling motions for summary judgment, which will be analyzed below.

¶ 9                                       The Clarendon Policy

¶ 10   We will recite the relevant portions of the Clarendon policy before analyzing the trial court's interpretation thereof which led to its contested ruling. The policy held that:

> "[s]ubject to the other provisions of this policy, the Company will pay on behalf of the Insured that portion of the Ultimate Net Loss in excess of the Retained Amount, which the Insured shall have become legally obligated to pay as damages and related Claims Expense because of Bodily Injury, Property Damage, Personal Injury or Public Officials' Errors and Omissions to which this insurance applies."

The relevant self-insured retention was listed as $250,000, and the Ultimate Net Loss specifically included costs of defense.

¶ 11   Further, the policy separately enumerated the amount of coverage thusly: "Each Occurrence or Wrongful Act, or Combination of Occurrence and Wrongful Act: $2,000,000," while the "Aggregate Limit for Personal Injury Liability, Products-Completed Operations Hazard and Public Officials' Errors and Omissions Combined: $2,000,000." Among the many definitions within the policy, and pertinent to our ruling, is the definition of "Incidental Medical Malpractice," which included allegations "arising out of emergency professional medical services rendered or which should have been rendered *** by any duly qualified medical practitioner, nurse, or technician, employed by or acting on behalf of the Insured." In addition, "personal injury" is defined in the policy as "injury, other than Bodily Injury or Public Officials' Errors or Omissions arising out of *** false arrest, detention, imprisonment [or] Malicious prosecution."

¶ 12   Another section of the policy that seems particularly focused on construction-related claims was central to the trial court's decision. It states:

"N. Products-Completed Operations Hazard

1. Includes all Bodily Injury and Property Damage occurring away from the premises the Insured owns or rents and arising out of the Insured's Product or the Insured's Work, except:

a. Products that are still in the physical possession of the Insured; or

b. Work that has not yet been completed or abandoned. However, the Insured's Work will be deemed completed at the earliest of the following times:

1) When all of the work called for in the Insured's contract has been completed.

2) When all of the work to be done at the site has been completed if the Insured's contract calls for more work at more than one site.

c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."

¶ 13                                    Summary Judgment Proceedings

¶ 14    Along with the policy and the relevant motions and arguments, the trial court considered our earlier opinion that affirmed the multi-million dollar judgment. *Abruzzo*, 2013 IL App (1st) 122360. As briefly mentioned above, the underlying claim regarded a father who called Park Ridge paramedics to come to his home, where he was having trouble awakening his 15-year-old child who was known to have a drug problem. The father, Larry Furio, was able to awaken his child, who told his father that he hadn't taken any drugs. Then the paramedics arrived. At that time, Furio sought to reassure them that his son was okay and that it was probably just asthma causing his breathing problems. As related above, the paramedics left without any specific assessment of the patient. They didn't even take his vital signs and made no report of their interaction. Hours later, the child was found unresponsive and ultimately died of a drug overdose.

¶ 15    The plaintiff's theory of liability was simply that the paramedics owed the decedent the duty to examine, assess, and transport him to the hospital. At trial, Park Ridge was ensnared by its earlier defense that it was entitled to immunity under the Tort Immunity Act (745 ILCS 10/6-105, 6-106 (West 2004)) because it had "provided no medical care of any kind, including evaluation, assessment, diagnosis, treatment, or documentation." *Abruzzo*, 2013 IL App (1st) 122360, ¶ 33. This argument persuaded the supreme court to rule that the city wasn't entitled to immunity if it provided no treatment. The case was remanded for trial, where a jury signed a general verdict, rejecting Park Ridge's arguments that the child was responsible for his own death, due to ingestion of narcotics, and that his father was also to blame for failing to give an accurate history to the paramedics.

¶ 16                                              ANALYSIS

¶ 17    We review the trial court's order granting summary judgment *de novo*. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009). Summary judgment is proper where the pleadings, admissions, depositions, and affidavits demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 201 (2008); 735 ILCS 5/2-1005 (West 2016). In

determining whether a genuine issue of material fact exists, the court must consider such items strictly against the movant and liberally in favor of its opponent. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 18　　The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court that are appropriate subjects for disposition by way of summary judgment. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). Duties of an insured are controlled by the terms and conditions of its insurance contract. *American Country Insurance Co. v. Bruhn*, 289 Ill. App. 3d 241, 247 (1997). In construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108 (1992). All provisions of an insurance contract should be read together to determine whether any ambiguity exists. *General Insurance Co. of America v. Robert B. McManus, Inc.*, 272 Ill. App. 3d 510, 514 (1995). If the words in the policy are unambiguous, a court must afford them their plain, ordinary, and popular meaning. *Insurance Co. of Illinois v. Stringfield*, 292 Ill. App. 3d 471, 473-74 (1997). But if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 363 (2006); *Outboard Marine Corp.*, 154 Ill. 2d at 108-09.

¶ 19　　During the briefing process in the trial court, Clarendon filed a supplementary brief that focused on the aforementioned "Products-Completed Operations Hazard" and argued that the City's "work" on the struggling child had been "completed" when the paramedics first left the residence. It was on this basis that the trial court ruled that the "aggregate" coverage applied. In so doing, it plainly ignored the language in the policy that directly covered the paramedics' failure to provide any treatment. Specifically, in the coverage that was not subject to the aggregate, Clarendon was to pay up to $2 million, *per occurrence*, for "incidental medical malpractice *** which should have been rendered *** by *any duly qualified medical practitioner*, nurse or *technician* employed by *** the Insured." (Emphases added.) Thus, the only reasonable construction of this insurance contract is that the failure to assess, treat, and transport the child by the paramedics and emergency medical technicians (EMTs) is not subject to the aggregate amount. We further observe that while the parties only use the term "paramedics" in their briefs, our supreme court opinion makes it clear that Park Ridge "dispatched a fire engine and an ambulance staffed by emergency medical technicians (EMTs), paramedics, and firefighters." *Abruzzo*, 231 Ill. 2d at 328. Therefore, as the language in the policy related to "Incidental Medical Malpractice" specifically mentions "duly qualified medical practitioner[s]" and "technicians," the presence of paramedics and EMTs squarely invokes this provision, which is plainly subject to the per occurrence, not aggregate, coverage.

¶ 20　　In light of our determination that this is a case of inaction on the part of Park Ridge's paramedics and EMTs, we are unpersuaded by Clarendon's reliance on cases finding no liability in the latter instances. *Cf. Baker v. National Interstate Insurance Co.*, 103 Cal. Rptr. 3d 565 (Ct. App. 2009) (where the court concluded that the "products-completed operations hazard" provision excluded coverage for injuries arising from the insured's negligent work off premises, *i.e.*, the inspection of a bus); *State Auto Property & Casualty Insurance Co. v. Midwest Computers & More*, 147 F. Supp. 2d 1113, 1117 (W.D. Okla. 2001) (where the court determined that the "products-completed operations hazard" provision provided coverage only

if the work was completed, but since the insured sought damages for loss of computer data during the time services were still being provided, the damages were not covered under the policy as the work was still ongoing).

¶ 21 Even if we were to attempt to apply the "Products-Completed Operations Hazard" language to these circumstances, we would still construe this provision in favor of the insured as we must. While Illinois courts have not previously addressed this issue, courts in other states have held that the term "products-completed operations hazard" generally applies to construction activities, maintenance, and related trades, not to professional services, such as EMTs or paramedics. For instance, in *American Red Cross v. Travelers Indemnity Co. of Rhode Island*, 816 F. Supp. 755 (D.D.C. 1993), the district court held that HIV-contaminated blood claims did not fall within the scope of the "completed operations hazard" provision of the insurance policy, and thus, the aggregate limit of the provision was inapplicable to the claim because each act of distribution constituted a separate "occurrence" under the policy. The court reasoned that the plain language of this provision did not apply to professional services contracts, such as medical personnel, but was "intended to apply to construction and maintenance work, such as work performed on the premises of others by contractors and subcontractors." *Id.* at 760; See *Visteon Corp. v. National Union Fire Insurance Co. of Pittsburg, PA*, 777 F.3d 415, 420-21 (7th Cir. 2015) (the Seventh Circuit noted that most courts have interpreted "completed operations hazard" narrowly to refer to "accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts" (internal quotation marks omitted)); *Hydro Systems, Inc. v. Continental Insurance Co.*, 929 F.2d 472, 477 (9th Cir. 1991) (the Ninth Circuit observed that products-completed operations hazard exclusions generally arise after completion of work by the insured on construction or service contracts); *Visteon Corp. v. National Union Fire Insurance Co. of Pittsburg, PA*, 30 F. Supp. 3d 792, 798-99 (S.D. Ind. 2014) (the court concluded that the references in products-completed operations hazard provision to " 'another contractor or subcontractor' and 'job site' reflect that this provision is intended to cover offsite contractor work," not environmental contamination claims); *HVAW v. American Motorists Insurance Co.*, 968 F. Supp 1178, 1183 (N.D. Tex. 1997) (the court noted that products-completed operations hazard "generally applies to construction activities, maintenance, and related trades," and thus, the insured's legal services did not fall under this provision).

¶ 22 We find the above case law persuasive and any fair reading of the "Products-Completed Operations Hazard" provision at issue (which is specifically included in aggregate coverage) has everything to do with construction operations undertaken by Park Ridge and nothing to do with a failure of treatment and transport by their EMTs and paramedics. Accordingly, the trial court erred in granting summary judgment to Clarendon.

¶ 23 CONCLUSION

¶ 24 Based on the foregoing, we reverse the judgment of the circuit court of Cook County in Clarendon's favor and remand the case for the trial court to enter summary judgment for plaintiffs Park Ridge and HELP.

¶ 25 Reversed and remanded.